ISABELLE E. BOYD, Appellant, *v.* ROBERT H. BOYD, Defendant, and BLANCHARD P. ATKINSON, Respondent.

(Argued December 4, 1929; decided January 7, 1930.)

*I. Maurice Wormser* and *Harry N. Selvage* for appellant. The Court of Appeals has the power, and it is its duty, to review the findings of fact. Due weight must be accorded to the original findings of the Special Term justice, who saw and heard the witnesses and was in

a better position to determine their reliability and veracity than the Appellate Division. (State Const. art. VI, § 7; Civ. Prac. Act, § 589, subd. 2; Van Bergh, New York Court of Appeals Jurisdiction & Practice, chap. 2, p. 33; *Exchange Bakery & Restaurant, Inc.*, v. *Rifkin*, 245 N. Y. 260; *Prager* v. *N. J. F. & P. G. Ins. Co.*, 245 N. Y. 1; *Matter of Flagler*, 248 N. Y. 415; *Forstmann* v. *Joray Holding Co., Inc.*, 244 N. Y. 22; *Baird* v. *Mayor*, 96 N. Y. 562; *Vermilyea* v. *Palmer*, 52 N. Y. 471; *Knickerbocker Life Ins. Co.* v. *Nelson*, 78 N. Y. 137; *Van Wyck* v. *Watters*, 81 N. Y. 352; *Shultz* v. *Hoagland*, 85 N. Y. 464.) The facts clearly establish all the elements necessary to constitute a common-law marriage. (*Gall* v. *Gall*, 114 N. Y. 109; *Townsend* v. *Van Buskirk*, 33 Misc. Rep. 287; *Matter of Terwilliger*, 63 Misc. Rep. 479; *Hynes* v. *McDermott*, 91 N. Y. 451; *Caujolle* v. *Ferrie*, 23 N. Y. 90; *Procita* v. *Procita*, 190 N. Y. Supp. 21; *Graham* v. *Graham*, 211 App. Div. 580; *Smith* v. *Smith*, 194 App. Div. 543; *Matter of Brush*, 25 App. Div. 610; *Christy* v. *Clarke*, 45 Barb. 529; *Matter of Seymour*, 113 Misc. Rep. 421; *Sorenson* v. *Sorenson*, 219 App. Div. 344.)

*Frank C. Laughlin* and *H. Preston Coursen* for respondent. The Court of Appeals may review the facts. (Civ. Prac. Act, § 589, subd. 2.) The testimony of Jane Morgan was clearly incompetent and the reception of her testimony over the objections and exceptions of the respondent was error and requires that her testimony be disregarded. (*Dysart Peerage Case*, 6 App. Cas. 489; *Matter of Taylor*, 9 Paige, 611; *Stackhouse* v. *Stotenbur*, 22 App. Div. 312; *Eisenlord* v. *Clum*, 126 N. Y. 552; 19 Am. & Eng. Ency. of Law, 1200; *Drawdy* v. *Hesters*, 130 Ga. 161.) The evidence adduced by plaintiff does not establish the alleged common-law marriage. (*Gall* v. *Gall*, 114 N. Y. 109; *Harbeck* v. *Harbeck*, 102 N. Y. 714; *Badger* v. *Badger*, 88 N. Y. 546; *O'Gara* v. *Eisenlohr*, 38 N. Y. 296; *Clayton* v. *Wardell*, 4 N. Y. 230; *Dietrich* v. *Dietrich*, 128 App. Div. 564; *Foster* v. *Hawley*, 8 Hun, 62; *Matter of Farley*,

91 Misc. Rep. 185; *Bell* v. *Clarke*, 45 Misc. Rep. 272; *Matter of Rossignot*, 112 N. Y. Supp. 353; *Bates* v. *Bates*, 7 Misc. Rep. 547; *Spencer* v. *Spencer*, 84 Misc. Rep. 264; *Moller* v. *Sommer*, 86 Misc. Rep. 110.)

O'BRIEN, J. In Kings county is now pending an action for the annulment of a marriage in which this intervening defendant, Blanchard P. Atkinson, is plaintiff, and the plaintiff in this action, Isabelle E. Boyd or Atkinson, is defendant (*Atkinson* v. *Atkinson*, 217 App. Div. 96). Therein the issue is whether Isabelle, when she participated in a marriage ceremony with Atkinson, was already married to Robert H. Boyd, now one of the defendants here. It is awaiting a new trial and will be determined in accordance with the result in the suit before us. This one, in which Atkinson has intervened as a party defendant, was instituted in Bronx county by Isabelle against Boyd to annul her marriage to him upon the ground that, when she joined in a ceremony with him, a common-law marriage existed between him and Annie Bernes. At Special Term such a common-law marriage was established. By the order of the Appellate Division, the findings and conclusions were reversed, new findings made and final judgment was directed dismissing the complaint. Since the reversal was not only on the law but also on the facts and new findings were made, our duty is to review the facts. (*Forstmann* v. *Joray Holding Co., Inc.*, 244 N. Y. 22; *Prager* v. *N. J. Fidelity & Plate Glass Ins. Co.*, 245 N. Y. 1; *Exchange Bakery & Restaurant, Inc.*, v. *Rifkin*, 245 N. Y. 260; *Matter of Flagler*, 248 N. Y. 415.)

The only issue before us relates to the question whether Boyd and Annie Bernes contracted a common-law marriage. The evidence, if credible, establishes such a marriage. In the record is embodied testimony of an unusual nature but not, as we think, beyond the bounds of probability. The ultimate issue is reduced to one of credibility.

In the year 1878 Annie Bernes was nineteen years of

age and Robert Boyd was twenty-four. She was a dressmaker living alone in Little Jones street on the lower west side of New York. He was a ship carpenter employed in the yards at Jersey City and living in that vicinity. A casual meeting occurred between them and on the first day of their acquaintance they entered into meretricious relations. For six months they lived together in Little Jones street and then, according to Boyd, they signed a marriage agreement and he gave her a wedding ring engraved with the initials " R. to A." The giving of the ring was for the purpose, as he expressed it, " to bind the bargain like." He thought that unless she had a ring, the marriage would not be " full fledged." Because they had made their agreement, he never took her to a minister. They did not think it necessary. She became known as Mrs. Boyd and he introduced her as his wife. Half a dozen times the witness Palmer visited the house in Little Jones street and was informed by Boyd that Annie was his wife. For a year and a half they lived there. Twice they separated but each time he returned. For three years they lived on Steuben street in Jersey City and during that time Boyd contracted a ceremonial marriage with Isabelle Ellen Milligan, the plaintiff in this action. Then he seems to have embarked upon a double life. As late as February, 1894, the witness Moran knew Boyd and Annie Bernes, then living together on Van Horn street in Jersey City, as Mr. and Mrs. Boyd. In June of the same year the witness Morgan knew Boyd and the present plaintiff, then living together on Boyd avenue in Jersey City, also as Mr. and Mrs. Boyd. During that month, according to Mrs. Morgan, Annie Bernes appeared at the Morgan home, displayed her marriage agreement and her wedding ring and threatened Boyd with prosecution for bigamy. Within a few days he told Mrs. Morgan that he was in trouble, could stay there no longer and was going away. He left a letter in which he stated that Annie Bernes was known

as Annie Boyd and that he had allowed her to tell her friends that they were married. Many years later he admitted to two of defendant Atkinson's witnesses, as they testify, that he had in fact given her a wedding ring, but only for the purpose of concealing from his parents the fact that he was living with a woman who was not his wife. A few days after the delivery of the threat to prosecute for bigamy, Boyd, abandoning the present plaintiff as well as Annie Bernes, departed for San Francisco. In the year 1903 Annie Bernes died and Boyd returned from California. During the interval, in 1901, plaintiff had married Atkinson who, after twenty-two years of life with her, has made her defendant in the Kings county action for annulment. Although in this record there is no competent evidence of a third marriage by Boyd, counsel for plaintiff stated unchallenged at the trial that in 1903 or 1904 he married Viola Glad and that offspring of that pair survives. Counsel for Atkinson in their brief in this court twice refer to and apparently concede the existence of this third affair and the survival of offspring.

No part of the evidence is viewed by us as incredible. The tangled course of Boyd and Annie Bernes, as related at the trial, embraces no more improbable features than that of thousands whose ways of life are inscribed in history and in the archives of the courts. Many an outcast, eager for a lawful status, has succeeded, at times even by bell and book and candle, at times only by written line or oral word, in persuading her paramour to raise her from her debased condition. In her ambition to become a wife, Annie Bernes might have copied the marriage lines from some document or she might have retained a lawyer to draw them for her before she presented them to her companion for signature. A rover like Boyd, if invited to transform a mistress into a wife, would probably indulge in no nice discrimination and, if he agreed *per verba de præsenti*, he might, at the time at least, have

intended to keep his promise. With the passing of the years his sense of marital responsibility would doubtless become even duller and more blunt. In his next affair he might not be unwilling carelessly to conform with the conventions and to submit to formal rite. If he committed bigamy, he could scarcely be expected, at the time, to declare otherwise than that his second marriage was his first. Self-protection would so impel him. Scruples would not impede him. When confronted by a deserted woman who claimed to be his wife and threatened by her with prosecution for bigamy, what conduct more natural, if the charge were true, than swift departure from the State, residence outside its jurisdiction during the rest of that woman's life and abstention from further marriage until her death? He abandoned his common-law wife, if she was one, in no less ruthless a spirit than that in which he deserted the wife, if she was one, whom he had taken by formal ceremony. In after years, in the State where he had lived with both, he married again when the first was dead and the second living. Omission to tell the whole truth on this and on the former trial is consistent with a desire to refrain as long as possible from admission of facts which brand his act as the commission of the crime of bigamy. Mrs. Morgan's recitation of the marriage agreement, unseen by her for so many years, is an uncommon feat of memory but even the achievement of such an exploit is not outside the realm of probability. A man and a woman, to all appearance a true married pair, dwell in her house. A second woman arrives and creates a painful and turbulent scene. That woman proclaims herself the real wife, displays a marriage agreement and a wedding ring and utters a declaration of intention to prosecute for crime. Had any other such dramatic event ever occurred in the commonplace life of this prosaic housewife? As the trial justice believed, that experience might well make an indelible impression on her memory.

The validity of any alleged common-law marriage is always open to suspicion. Especially is doubt justified when one of the parties is dead. Clear, consistent and convincing evidence is required to establish the fact. This natural suspicion must, however, be dispelled when testimony, if reasonably believed, proves the existence of circumstances inconsistent with the absence of the alleged marriage. If the testimony in this record be not perjured to the effect that, immediately after threats of prosecution for bigamy had been uttered by a woman claiming to be a common-law wife, the alleged husband fled and during the lifetime of that woman remained outside the jurisdiction of the State where the crime was asserted to have been committed, then facts are proved tending in a very high degree to exclude any reasonable belief that the fugitive had been a bachelor when he pretended to marry the present plaintiff. Ordinary knowledge of human nature might impress the trial justice with a settled conviction that the normal man could not have been driven to flee from his home and a lawful wife by blackmailing threats of a discarded mistress to whom he owed no enforceable obligation. Motives for false swearing by him may be imagined, but neither are motives for telling the truth at this late day, even at the expense of exposing himself as a criminal in his young manhood, difficult to discover. Counsel for respondent suggest that he has a motive to commit perjury by reason of the fact that, if his marriage to plaintiff be annulled, he would be free from a charge of bigamy in marrying Viola Glad. On the other side of the scale, an equally reasonable inference for believing him to tell the truth can be drawn from the fact that his bigamous marriage with plaintiff was committed so many years ago that his crime is now stale and he will incur slight if any danger of prosecution and that his revelation of the truth will establish not only the validity of his marriage with Viola Glad but, with it, the legitimacy of their surviving son.

Either hypothesis is reasonable. Which is true? In a case so close as this, let the court of first instance decide. Face to face with living witnesses the original trier of the facts holds a position of advantage from which appellate judges are excluded. In doubtful cases the exercise of his power of observation often proves the most accurate method of ascertaining the truth. Annie Bernes may have held no higher place in life than mistress of the man with whom she lived for sixteen years. She may have been his wife. In the presence of the judge, Boyd swore that he had taken her to wife. The judge heard the sound of his voice and gazed upon his countenance and tells us that he believes the witness spoke the truth. Mrs. Morgan swore that she read the marriage lines, saw the ring and heard the woman assert her status as a wife, and the judge declares her to be honest and reliable. Moran swore that, sixteen years after the inception of the meretricious affair, the couple were known to him as man and wife, and the judge describes him as impressive and convincing. How can we say the judge is wrong? We never saw the witnesses. No worldling could read the printed lines before us without pausing to reflect that such things as they recount do often happen. To believe that in fact they did happen to Annie Bernes and Robert Boyd is not to stamp one as too artless and ingenuous. To the sophistication and sagacity of the trial judge the law confides the duty of appraisal. If these witnesses imposed upon the credulity of an experienced fact finder, this court cannot correct him. His was the opportunity, the responsibility and the power to decide.

The judgment of the Appellate Division should be reversed and that of the Special Term affirmed, with costs in this court and in the Appellate Division.

POUND, CRANE, KELLOGG and HUBBS, JJ., concur; CARDOZO, Ch. J., and LEHMAN, J., dissent.

Judgment accordingly.