LEO KRUCZEK, Respondent, *v.* EDITH LUCILLE KRUCZEK, Appellant.

First Department, June 5, 1942.

*William S. Bennet* of counsel [*James E. Bennet,* attorney], for the appellant.

*Harold Hyman* of counsel [*Freeman & Hyman,* attorneys], for the respondent.

GLENNON, J. This is an action for absolute divorce. Plaintiff, in whose favor judgment was entered, married the defendant on January 28, 1930. One child was born of the marriage on March 23, 1935. Shortly after the birth of the child, plaintiff ceased to cohabit with defendant. He frequently absented himself from

his home. In fact, he rented a three-room apartment at Woodside, Long Island, in 1939 and resided there until the end of September, 1940.

At the time of the trial defendant was thirty-nine years of age, whereas the plaintiff was about six years younger. The corespondent, Guerdon Herblin, was twenty-three years of age. The corespondent owned a motorcycle and he and the plaintiff were accustomed to go out riding on it frequently. Herblin kept his motorcycle in the garage on the premises of the parties' home in Flushing. The plaintiff and he, as late as September, 1940, worked together in the garage, apparently in connection with the motorcycle. During this period their relations were very friendly.

In view of the testimony offered by plaintiff at the trial, it might be well at the outset to quote from the opinion of the Court of Appeals in *Moller* v. *Moller* (115 N. Y. 466). There Judge EARL, in writing for a unanimous court, said, in part: " We agree with the learned judges of the General Term in their low estimate of the value in divorce cases of the evidence of prostitutes and private detectives. The courts have come to regard the uncorroborated evidence of such witnesses as insufficient to break the bonds of matrimony. [Citing cases.] The consequences which follow a judgment of divorce are so serious and momentous that such a judgment should not be granted without the evidence which furnishes the basis therefor, is, after very careful scrutiny, satisfactory and such as can command the confidence of a careful, prudent and cautious judge."

One William R. Wittenberg, a private detective, testified that he was employed by the plaintiff on October 4, 1940, " to see the conduct of his wife and give him reports on the result of his wife's conduct." The agreed price for the services which were to be rendered was $350, payable in advance. He first saw the corespondent on the evening of October 5, 1940, at about eight P. M. when Herblin entered defendant's home. At that time he was concealed behind some bushes across the street and was using " a very strong pair of opera glasses." Later he took a position near a window at the side of the house and observed defendant and the corespondent " hugging and kissing." Incidentally it should be noted that this witness testified that the side window through which he looked had a shade but that it was never drawn, " that would always be pulled halfway." Apparently there was no attempt at concealment. He further stated that he observed them on occasions from a window in the rear of the house and that the defendant while at home wore either dark pajamas or a loose house dress.

In the decision the court has found: " That heretofore, and on the 25th day of November, 1940, at 27–10 — 163rd Street, Flushing, in the Borough of Queens, City of New York, the defendant committed adultery with one, Guerdon Herblin, the corespondent named in the complaint."

The justice who presided at the trial, later in his opinion pertaining to the custody of the child, said in part: " Aside from the single moral lapse referred to there is no evidence establishing that defendant is unfit to have the custody of her son  *  *  *."

The chief witness against the defendant was the detective, Wittenberg. His testimony covered the events which led up to a raid upon the premises. Following the rule laid down in the cases, it is necessary to scrutinize his testimony carefully and contrast it with that of one Alva North who was called as a witness by the defendant. It is not feasible to detail at length in this opinion everything that Wittenberg testified to. He said he saw the corespondent enter the premises of the defendant at about eight-thirty P. M. Before entering he rang the bell. The defendant came to the door, kissed him and both walked into the vestibule. Shortly thereafter the detective saw the defendant, wearing a loose house dress, and Herblin sitting on the couch in the living room. He then observed the defendant go into the kitchen in the back of the house. She had a glass " of some liquid, water, or whatever it was in this glass, and then she lied down on the couch." The defendant and the corespondent were drinking, hugging and kissing and at the same time the corespondent was rubbing his hand on the exposed part of the defendant's feet.

The detective then had a conversation with the plaintiff, after which he left and went away for about twenty minutes for the purpose of bringing two witnesses to the scene. It developed later that the witnesses were two brothers, only one of whom was called at the trial. Upon his return, the detective went to the side window. Here it might be of interest to note that on being apprised on cross-examination that the sill of the side window was about eight feet above the surface of the ground, the detective who was less than six feet in height, conveniently and for the first time during his testimony, produced a box upon which he stood. The question which brought forth that answer and the reply of the witness are as follows: " Q. Yes. You couldn't stand back from that side window at all, you had to stand right up close to the window, didn't you? A. No. There is a little bit of a passageway there and we had a box all planted there and we continually looked in from that box."

The box was " An old wooden box that we had planted in those bushes.   *   *   *   The size of a beer case box." On being asked, " Where did you get the box? " he said, " Oh, in the neighborhood somewheres. It was laying around. When I first got there, we placed it in the bushes." He was asked, " Which part would you stand on, the end or the side? " to which he replied, " You would turn the box upside down, or you would try to stand on the end of it, if it would hold." When asked how high the box would elevate him, the witness stated, " Elevate you about two feet or two and a half." On further cross-examination, the following appears:

" Q. At how many windows did you need boxes to stand on? A. You needed in the rear of the house, alongside of the garage — you needed a box or two to stand on to look into the kitchen if the opportunity afforded itself. You needed a box or so to stand alongside of the house in those bushes in order to look in through that window which looks right into the living room.   *   *   *

" Q. Did you have a box for each window, two separate boxes? A. I would not say boxes for each window. Whatever was standing there or whatever we made up we stood on. It was only for a little time that you could stay there, because the rattling of the shrubbery could be heard inside, we had to get out and make as quick a getaway as possible."

From the box he saw the corespondent standing up, " put his hand on his pants and pull them down." After a brief discussion between him and the plaintiff, who was at his side, the two Blackham brothers were called over from a parked automobile in which they had been sitting. The four men entered the house after plaintiff had used his key to open the door. The detective testified, " Mr. Guerdon at that time was running towards the door and he had his hand on his pants buttoning his pants." Upon being asked by the court which portion of the trousers he referred to, the detective replied, " the front part." The detective further testified that a scuffle occurred between plaintiff and the corespondent, " both were hitting one another."

Incidentally, attention should be directed to the fact that each time the detective might have been in a position to observe whether in fact an act of adultery was committed on the night of November twenty-fifth, the date fixed in the decision, he conveniently absented himself. First he left the scene for a period of about twenty minutes for the purpose of procuring the Blackhams as witnesses. He then returned with plaintiff to his position on the box. He did not direct the latter to notify the witnesses while he remained to continue his observations, rather he went around to the front of the house and " about 10 minutes later, five or ten minutes

later, after signaling them, we went in, and that was five minutes after ten or thereabouts."

While the Blackham brothers were present at the scene, only one, Joseph F. Blackham, Jr., was called as a witness. He testified that plaintiff opened the door with a key, Wittenberg followed and " I went in behind with them." He said, " I saw Herblin when he was pulling his pants up when we entered the house."

Either the detective or Blackham did not tell the truth as to what Herblin actually did with reference to his clothing, a matter of no small importance to the defendant when the charge against her is considered. While, as to the night of November twenty-fifth, he corroborated the detective concerning the fact that the defendant was actually lying upon the couch — a fact which defendant and her witnesses also asserted — still that in substance was the only thing, with the exception of the scuffle, that he could remember.

The defendant denied absolutely any wrongdoing on her part either on the night of November twenty-fifth or on any other occasion. She freely admitted that the corespondent visited her home on a great many occasions when her husband was not present. As to the events of the night in question, she testified that she had bathed her youngster at about seven p. m. and put him to bed, she came downstairs and fell asleep on the sofa in the living room. She was wearing a street dress at the time. Some two hours later she was awakened when she heard the victrola playing in the living room. She saw Alva North and Herblin standing at the victrola. At the time they were playing a record which Herblin had made. It was a recording of a song by him. She testified that after listening, " I criticized the record after I had listened to it, both sides, and I criticized the tonal qualities and the interpretation, and I thought it a very good record." Immediately after the record was played, " We heard a noise outside, and I said to Guerdon, ' Would you go to the door and see what that noise is? ' " She then observed the men coming into the house and witnessed the scuffle between Herblin and not her husband, as the detective and Blackham had said, but the detective.

The corespondent, on his part, denied that he had sexual relations with the defendant on that night or any other time. His testimony, particularly as to the happenings on the night of November twenty-fifth, is at variance, to say the least, with that of the detective. He said that he arrived at the house between seven-thirty and eight o'clock. He rang the front door bell and was admitted by Alva North. At that time defendant was asleep on the sofa which was on the left-hand side of the living room. He went with Alva

North to the kitchen in the rear where the latter was doing her school work. Later Alva made coffee which they drank. At about ten o'clock he wished to have the defendant hear the record he had made. Alva and he went into the living room, played the record and awakened the defendant. Later Alva returned to the kitchen and shortly thereafter he heard a noise outside. He went to the front door, opened both the inner and outer doors of the vestibule and asked the crowd of men what they wanted. He then said, " They rushed me at the door and forced me through the door back into the living room." He testified that he had a scuffle with the detective and that plaintiff was not present at the time but came in some five or ten minutes later when he was called.

Before reviewing the testimony of Alva North, it might be apropos to quote from the statement of the trial justice which appears in the record near the conclusion of the case. It is in part: " I think that the young girl employed in the household of the Kruczeks, Alva, told the truth as to what she saw. There is no question about her testimony."

Alva North, a girl twenty-one years of age, entered the employ of the defendant on October 17, 1940, and continued until December twenty-first of the same year. She was a student at Queens College in Flushing. She testified, " I wanted to have some way of making my college expenses on the side, so I put an ad in the paper asking for a room and board and a small allowance for the care of a child, and Mrs. Kruczek answered my ad." It is unnecessary to detail at length either the hours she spent at college or the services she rendered at the Kruczek household. She said, in substance, that upon the night of her arrival at the Kruczek's home, the plaintiff came to the house but after that he appeared only once a week. She testified that on the evening of November twenty-fifth, after the child had been put to bed, defendant came downstairs and had a glass of wine. Shortly afterward defendant fell asleep on the sofa in the living room. About seven-thirty, or quarter to eight, Herblin appeared. She admitted him and told him that the defendant was asleep. Herblin and she went into the kitchen where she had been doing her homework. They sat and talked for awhile. She made coffee and at approximately ten o'clock they entered the living room to play the victrola. After the defendant awoke, she listened to Herblin's record, criticized it, and shortly after Alva returned to the kitchen to resume her school work. About fifteen minutes later she heard "this awful commotion." She looked into the living room, being in a position to see it through the doorway of the kitchen from the table at which

she was sitting. She walked through the dining room where one of the men in the party " grabbed me and took me into the kitchen and he put his arms across the door and would not let me go through." She denied that the corespondent had ever slept there. She further denied ever seeing any wrongdoing either on that night or any other occasion between the corespondent and the defendant. In fact the following series of questions and answers will indicate the type of girl she was: " Q. Did you ever see them do anything which would indicate that their relations were immoral? A. No. If I had, I would have moved out. Q. You would not have stayed there? A. No. * * * Q. You live home with your folks? A. Yes. Q. Did you ever see any hugging and kissing? A. No. Q. Did you ever see him put his arm around her? A. No. Q. Did you ever see him put his hand over any part of her body? A. No. Q. Did you ever see him do anything to indicate that they were intimate in their relations? A. No, I did not."

When questioned she made reference to the rough diagram of the house which was introduced into evidence, and which sets forth the position of the kitchen table and the doors, indicating that a person sitting in the same position as she was on the night in question could have seen the living room and the couch which was on the left-hand side of it as one enters the house.

The contrast between the testimony of Alva North and the private detective as to what occurred in the household prior to the raid, is self-evident. Either Alva North, upon whose testimony the justice presiding at the trial put his stamp of approval, did not tell the truth, or the detective, whose testimony must be carefully scrutinized, was guilty of false swearing. That the defendant and the corespondent, so called, would have committed adultery on the night of November twenty-fifth in the presence of this young girl of high character, seems impossible. In writing this, we have in mind the conclusion of the first paragraph of Judge EARL's opinion in *Moller* v. *Moller*, from which we have already quoted. It reads as follows: " But the illicit amours of faithless husbands and wives are usually clandestine, and their wicked paths are hidden from public observation; and hence courts must not be duped, and they must take such evidence as the nature of the case permits, circumstantial, direct or positive, and bringing to bear upon it the experiences and observations of life and thus weighing it with prudence and care, give effect to its just preponderance."

While the case of *Boyd* v. *Boyd* (252 N. Y. 422) has been cited in the minority opinion to sustain the judgment of Special Term, we do not believe that it is controlling here. We are familiar with the testimony which was adduced. There, for the most part, the

witnesses called by the plaintiff gave testimony as to events which had occurred some fifty years before the trial which indicated that Boyd had entered into a common-law marriage with one Annie Bernes long prior to his marriage to Mrs. Boyd. It will be seen from a study of the opinion of the Court of Appeals together with a reading of the majority and dissenting opinions in the same case (which is reported in 226 App. Div. 358), that what both courts were dealing with was the credibility of the testimony adduced on behalf of Mrs. Boyd. After reviewing the evidence at some length, Judge O'BRIEN, writing for the majority of the Court of Appeals, said in part: " In a case so close as this, let the court of first instance decide. Face to face with living witnesses the original trier of the facts holds a position of advantage from which appellate judges are excluded. In doubtful cases the exercise of his power of observation often proves the most accurate method of ascertaining the truth." There was no private detective in that case, as here, whose testimony had to be carefully scrutinized and corroborated. Therefore, we do not believe that it has any application.

The judgment should be modified to the extent of directing that the complaint be dismissed, with costs to the defendant-appellant, and as so modified the judgment so far as appealed from should be affirmed, with costs to the defendant-appellant.

TOWNLEY and UNTERMYER, JJ., concur; MARTIN, P. J., dissents and votes to affirm.

MARTIN, P. J. (dissenting). The prevailing opinion has set forth some of the pertinent facts in this case. Additional and relevant facts and testimony which sustain the conclusion that the judgment in favor of the plaintiff should be affirmed will be set forth herein.

As the basis for reversal, the prevailing opinion cites *Moller* v. *Moller* (115 N. Y. 466). In my opinion that case is a direct authority for affirming the judgment. Although the Court of Appeals there held that the uncorroborated evidence of prostitutes and private detectives is insufficient to sustain a charge of adultery in an action for divorce, it pointed out that where the testimony of such witnesses is corroborated by proofs of facts and circumstances harmonizing therewith, giving such weight and strength to the testimony as to induce belief in its truth, a judgment founded thereon should be sustained. The court then reversed the decision of the General Term which had in turn reversed a judgment of divorce granted to the plaintiff. (45 Hun, 590.) In very forceful language the court said: " But the illicit amours of faithless husbands and wives are usually clandestine, and their wicked paths are hidden from public observation; and hence courts *must not be duped,*

and they must take such evidence as the nature of the case permits, circumstantial, direct or positive, and bringing to bear upon it the experiences and observations of life, and thus weighing it with prudence and care, give effect to its just preponderance." (Italics ours.)

The *Moller* case was later referred to and limited or distinguished by the Court of Appeals in *Winston* v. *Winston* (165 N. Y. 553). The rule that evidence of detectives or of persons of so wholly debased a character as prostitutes should receive some corroboration in order to command judicial confidence was there held to be a rule for the guidance of judicial conscience, not a rule of evidence. At page 557 the court said: " The corroboration which such evidence should receive must, simply, be such as to justify a belief that the incriminating testimony given is true. *Slight corroboration would be sufficient.* Here it is found in the testimony of the woman who had charge of the house in which the plaintiff was found by the detectives. Her testimony was that the detectives were in the house on the night in question; that one of them asked to see the plaintiff; that she took him to his room, rapped on the door and heard him respond and that she ' heard some disturbance after that.' She did not see the woman in the room; but it was not essential that that fact, while a material one in the case, should be testified to by her. Her testimony established, if believed, the material fact of the presence of the detectives in the house and of that of Winston." (Italics ours.)

A thorough consideration of the record now before this court discloses a great number of separate facts and circumstances testified to by the defendant and her witnesses, as well as the witnesses called by the plaintiff, which corroborate the testimony of the detective and fully sustain the finding of the court at Special Term that the defendant and Guerdon Herblin committed adultery as alleged.

In addition to his testimony that he saw the defendant lying on a couch with her person exposed and the corespondent Herblin pulling down his trousers and that upon entering the house with the plaintiff and two disinterested witnesses he saw Herblin running toward the door " buttoning his pants," the detective testified to other important facts. He stated that the defendant had been drinking liquor. He also said that she wore no shoes. Furthermore, he said that on at least ten occasions between October 5 and November 25, 1940, the corespondent visited the defendant at her home. Some of these visits occurred as early as nine o'clock in the morning or during the day when the defendant had no maid or other person in the house. Other visits took place in the evening

when the corespondent remained until late at night. On some of these occasions he saw the defendant and corespondent kissing, hugging and embracing each other.

The testimony of the detective concerning the incidents which occurred upon his entry into the Kruczek home was corroborated in all material details by Joseph F. Blackham, Jr. This disinterested witness was, with his brother, a member of the " raiding " party. He testified he was a married man who for nine years had worked with his father and brother in the moving business. After entering the living room in the Kruczek home he observed the corespondent " pulling his pants up " and the defendant lying on the couch. His description of the defendant's appearance in a house dress, without shoes and with "tresses" that were disarranged, confirmed that given by the detective. It may be here noted that this witness said that his brother, who was also present on November 25, 1940, was working on the day of the trial, thus explaining his absence from court.

Rose Gunther, a maid employed by the Kruczeks from January until June, 1940, testified as a witness for the plaintiff. She said she saw the corespondent at the house two or three times a week when the plaintiff was not at home. She observed their conduct and on one occasion had a talk with Mr. Herblin, who said " he was very much in love with Mrs. Kruczek, and that if she was divorced he would marry her." This witness also testified that she saw the defendant drink sherry wine " quite a bit." She stated that on one occasion the defendant " had been drinking and she was quite hysterical and I was afraid to stay there alone, and my husband had to go to work early the next day, so he went to bed in Mr. Kruczek's room. So, being that Mr. Herblin was not working, I figured that he could sit up with me all night to take care of her. Q. And did you and Herblin stay all night to take care of her? A. Yes."

The corespondent was called as a witness by the defendant. He denied any improper relations with Mrs. Kruczek. He did admit that he took her motorcycling and roller-skating, but denied that he had ever gone on any trips with her. He also admitted remaining over night with Mrs. Gunther on the occasion when the defendant had been drinking and became hysterical. In addition, this witness said he called at the house " two or three times a week " at various hours. He denied, however, he was there as early as nine o'clock in the morning but said he did arrive at ten. He also said that on four or five occasions in late October or early November, after the defendant had retired, he remained in the house talking to the maid and that when she too went to bed after midnight he

remained in the house and did not leave until two-thirty or three o'clock in the morning, despite the fact that all the other persons in the household were upstairs in bed. His testimony concerning the number of times he called upon the defendant is very interesting: " Q. How often did you visit her since you met her? A. Oh, quite a number of times. Q. Hundreds? Hundreds of times? A. Possibly. Q. So that the friendship that was existing between your mother and Mrs. Kruczek developed into hundreds of visits by you? Is that the fact? A. Yes, that is right."

The defendant testified that her husband was " dull." Although she asserted that the corespondent was a friend of both parties to this action, she admitted that in the years they were acquainted the three went out together on only one occasion. She also admitted that the corespondent called at her home two or three times a week at various hours of the day and night. She said that on occasions he remained in the house talking to Miss North after she had gone upstairs to sleep.

On one occasion she said she had driven to Atlantic City with the corespondent, leaving at eight o'clock in the evening and returning at five or five-thirty in the morning. She thus contradicted the testimony of the corespondent that they took no trips together except " just around town." She also admitted that the corespondent had remained overnight on one occasion, at the suggestion of Mrs. Gunther, who also stayed to take care of the defendant, whose testimony on the subject is as follows: " Q. Do you remember the occasion when you were intoxicated? * * * Q. Do you remember that occasion? A. I can't say exactly that I was intoxicated; I had two glasses of wine. I don't know the taste of liquor."

The record clearly establishes that on some of the visits of the corespondent he was alone with the defendant. Miss North, the college student acting as part-time maid from October 17, 1940, was called as a witness by the defendant. She said that during the five weeks immediately preceding November 25, 1940, the corespondent called on the defendant at least twelve times. She also said that on occasions as she was leaving for college about eight o'clock in the morning she would see the corespondent come in. In this respect she corroborated the testimony of Detective Wittenberg who said he saw the corespondent leave the premises at nine o'clock in the morning. She also contradicted the corespondent, who denied he ever called on the defendant before ten o'clock in the morning. In addition, Miss North testified that on the evening of November 25, 1940, Mrs. Kruczek " had a few glasses of wine " and thus corroborated the statement of Detective Wittenberg that the defendant was drinking on that evening.

This witness also testified that on about five occasions the corespondent remained in the house after the defendant and the witness had retired, although it was then after midnight. In this connection she gave the following testimony: " Q. Didn't you think it rather strange that he should have remained after everybody in the household had retired? A. Well, I didn't think much about it, because I knew he worked nights and he was not tired. Q. Did not it arouse any curiosity in your mind? A. I don't know. Why should it? Q. I don't know. Did it? A. No."

Miss North's testimony also established that the defendant and the corespondent were alone in the house. She testified: " Q. Were you with them all the time that he was there? A. Of course not. How could I be? Q. I am asking you. Were there occasions when they were alone without your chaperoning them? A. Of course."

A question concerning what Mrs. Kruczek and Mr. Herblin did when they were together brought the following interesting response from Miss North: " Q. What did they do there when they spent hours and hours together? A. They talked. Q. Talked of what? A. Anything. Q. I was not there and the court was not there. Please tell us what they talked about. A. What do people generally talk about? I do not know."

The foregoing sufficiently demonstrates that the defendant and the corespondent were frequently alone in the house and that they enjoyed each other's company; went motorcycling, roller-skating, driving in her car and talked for hours and hours on the numerous occasions that he called upon her. In addition, a wholly disinterested person testified that the corespondent said he would marry the defendant if she obtained a divorce.

An issue of fact for the trial court was presented by the testimony of the detective, amply corroborated in a number of instances by that of other witnesses, including the defendant's witnesses and admissions of the defendant and corespondent. In granting the motion of plaintiff for judgment against the defendant the court said:

" The evidence is quite clear, and I am concerned to find that there was opportunity and inclination, from the incriminating circumstances that have been testified to, even by the defendant's witnesses. I think that the young girl employed in the household of the Kruczeks, Alva, told the truth as to what she saw. There is no question about her testimony. Of course, the incriminating act was not in her presence, but she testified to it. I lay more stress on her testimony than all the testimony to show circumstances, that this man Guerdon, the corespondent, came there at times

when she went to school at eight o'clock in the morning; that he remained there at night after both she and Mrs. Kruczek retired. No intelligent person would believe that he came there at eight o'clock in the morning just to fix his motorcycle.   *   *   *

" And he did not stay there after midnight to complete fixing the motorcycle. Here is a husband and wife who are separated practically. That is, they did not have the relationship of husband and wife for years. Here is a young man constantly coming to the home, not to see the husband; he did not see the husband but he was constantly in company with the wife.   *   *   *

" There is one conclusion I can come to from all the evidence in this case, that the allegations of the complaint have been proved and I so hold."

In *Boyd* v. *Boyd* (252 N. Y. 422) the Court of Appeals in reversing the Appellate Division and sustaining the trial justice who had granted a judgment to plaintiff in an annulment action, held that where the evidence, if credible, establishes the essential facts and there is nothing therein outside the realm of probability, the decision of the trial justice who saw and heard the witnesses should not be disturbed.

It is quite proper again to quote from the opinion in the *Moller* case (*supra*): " We are satisfied that the evidence was sufficient, in the language of Lord STOWELL in *Chambers* v. *Chambers* [1 Hagg. Con. R. 439], to ' lead the guarded discretion of a reasonable and just man to the conclusion ' that the adultery charged had been committed."

The finding by the court that the defendant committed adultery is fully supported by the record.

The judgment appealed from should be affirmed.

Judgment modified to the extent of directing that the complaint be dismissed, with costs to the defendant-appellant, and as so modified the judgment so far as appealed from is affirmed, with costs to the defendant-appellant. Settle order on notice, reversing findings inconsistent with this determination, and containing such new findings of fact proved upon the trial as are necessary to sustain the judgment hereby awarded.