(May 20, 1971)

In the Matter of Norma Lopez, Appellant, v. Luis A. Sanchez, Respondent.—

Concur — Stevens, P. J., Markewich, McNally and Steuer, JJ.; Capozzoli, J., dissents in the following memorandum: I can see no valid reason for reversing the determination of the court below on the

issues of fact before it. Bearing in mind that the evidence in a filiation proceeding must be of such a nature that it is sufficient to create a genuine belief in the mind of the trier of the facts that the respondent is the father of the child, the court below concluded that the proof before it did not meet this standard and therefore denied the petition. Even though we might disagree with the result reached, that does not give us the right to set aside the trial court's determination. The law is settled that the burden is on the petitioner to sustain her claim, in accordance with the test laid down by the cases. In *Commissioner of Welfare* v. *Ryan* (238 App. Div. 607, 608) the court said: "The reason for the requirement that the proof in a proceeding of this kind should amount to more than a mere preponderance of evidence is obvious upon even a casual consideration of the character of the proceeding. * * * In filiation proceedings, however, the charge is so easily made and so difficult of satisfactory answer by the defendant and the consequences of conviction are so serious that the courts of this State have set up a somewhat stricter test. We see no reason to attempt further to define the standard than to say that the phrase 'entirely satisfactory' does not require proof of the claim beyond a reasonable doubt but does require evidence sufficient to create a genuine belief in the mind of the trier of the facts that the defendant is the father of the child. If that belief is not established because of the contradictory assertions of the witnesses, or for other circumstances, the claimant should be deemed to have failed to establish the charge made." Petitioner's failure to give a satisfactory explanation of her relations with the missing witness, Ivan Ruiz, was an important consideration for the court below. Upon cross-examination petitioner testified, concerning said Ruiz, as follows: "Q. All right, let me ask you this, do you know Ivan Ruiz? MR. LEFCOURT: Objected to. THE COURT: Know who? What's the name? MR. PENN: Ivan Ruiz. THE COURT: Ivan? MR. PENN: Yes. THE COURT: Objection overruled. A. Yes, I know Ivan Ruiz. Q. Were you ever keeping company with him? A. No, not company no. I wouldn't call that company. THE COURT: Did you date him? THE PETITIONER: Well, he used to work in the store that I used to — they sell furniture — THE COURT: Did you ever go out on dates with him? THE PETITIONER: No, not on dates." Ruiz, although served with subpoenas issued by both counsel and later by the court, failed to appear, but his former girl friend (Hilda Pinon) did testify. She testified that she saw petitioner and Ruiz in a restaurant in May, 1968. She noticed that petitioner was wearing Ruiz's gold chain and Jewish medal around her neck. It appears that these same articles had been previously given to Hilda by Ruiz. At this point it is helpful to quote the testimony of Hilda on this subject. At pages 65–66 of the trial minutes we find the following: "Q. Can you tell the Court what she said to you and what you said to her? A. I asked her what was she doing with the chain — what was she doing with my boy friend's chain around her neck. Q. Can you describe the chain? A. It was a gold chain with a Jewish medal on it. Q. Was your boy friend with you? A. My boy friend was with her at the time. Q. What is your boy friend or who was your boy friend at that time? A. Ivan Luis [Ruiz]. Q. What was her answer to you? A. She told me that my boy friend had given it to her as a present. Q. All right, what did you do at that point? A. I remained and they left. Q. All right, did you ever have occasion, after that, to see the respondent — to see Mrs. Lopez? * * * A. Three weeks later, in her house. Q. In Mrs. Lopez's house? A. Yes." Later, at page 67 of the trial minutes: "Q. What was the circumstances surrounding this meeting? * * * A. I went to her house with my boy friend to fetch the chain." Again, at page 68: "Q. All right, now you went to her house to fetch the chain. All right, now what did you say to her and what did she say to you at her house? A. I asked her to

give me the chain back, she told me she was going to keep the chain and she was going to stay with Ivan. Q. All right, did she say anything else to you or did you say anything else to her? A. I took my chain and she told me that she was going to remain with him, and so I left. Q. Well, were those the words she used, if you can recollect? * * * A. She said she loved him. * * * A. She liked him — Mrs. Lopez." Again, at page 69: " Q. When you were at the apartment, was your boy friend, Ivan, with you at the time? A. He went with me. Q. Did you leave with him? THE WITNESS: (English) No. A. No, he left and — he stayed — I beg your pardon — and I left." Petitioner took the stand in rebuttal and, at page 164 of the trial minutes, evidently referring to the visit made to the petitioner's apartment, as testified to by Hilda Pinon, at which time the latter was accompanied by Ivan Ruiz, petitioner testified as follows: " Q. Now, in September and October, was there anybody with her when she came to visit you? A. Yes, Mr. Ivan Ruiz." She then gave an account of what took place at that time, but it is most important to note that she did not deny that she had been wearing the chain and medal allegedly given to her by Ruiz, nor did she deny that they were returned to Hilda and did not deny having said that she loved or liked Ruiz. The petitioner was rather active in interfering with answers given by witnesses in the course of the hearing when she believed that those answers would hurt her. I am speaking of the witnesses called by her. In fact, she was admonished by the trial court several times not to interfere. Time and again it has been held that a trial court is in a far better position to judge the veracity of a witness than an appellate court. In *Boyd* v. *Boyd* (252 N. Y. 422, 429) the court said: " Face to face with living witnesses the original trier of the facts holds a position of advantage from which appellate judges are excluded. In doubtful cases the exercise of his power of observation often proves the most accurate method of ascertaining the truth. * * * The judge heard the sound of his voice and gazed upon his countenance and tells us that he believes the witness spoke the truth. * * * How can we say the judge is wrong? We never saw the witnesses. * * * To the sophistication and sagacity of the trial judge the law confides the duty of appraisal. If these witnesses imposed upon the credulity of an experienced fact finder, this court cannot correct him. His was the opportunity, the responsibility and the power to decide." In *Rives* v. *Bartlett* (215 N. Y. 33, 38) the court said: " The decision of the trial judge on the facts should not be lightly disturbed by a court which can glean the facts only from the printed pages of a record and the practice on appeal of granting final judgments on a different view of the facts to that taken by the trial court may, except in reasonably plain cases, lead to grave injustice." In *Kelly* v. *Watson Elevator Co.* (309 N. Y. 49, 51) the court said: " It is axiomatic that where there is a conflict in the evidence as to the issues controverted, matters of credibility and weight are for the jury to determine or, if the trial be without a jury, for the trier of the facts." The majority refers to the testimony of a merchant seaman with reference to his allegation that he had been intimate with the petitioner. In this connection the trial court, in dismissing the petition, made the following observation: " He [the merchant seaman] further testified that petitioner had a scar about 12 inches long running from the shoulder, * * * to the center of chest. It is important to note that prior to testifying, the witness was interviewed and questioned by respondent and his attorney. On a subsequent trial day, petitioner denied knowing the above-mentioned witness and physically bared her shoulder and chest. There was no discernible scar. Against this background, the conclusion is inescapable that if respondent had sexual relation with petitioner under the conditions she testified to, the respondent would have known that the petitioner had no scar."

The court was called upon to decide the issue of paternity, raised by the petitioner, a 40-year-old divorcee, mother of two children, against the respondent, a 22-year-old college student, who earned about $20 a week in the SEEK program at college. The trial court was exceedingly fair and it is evident that it made every effort to get at the facts. In the face of the totality of the evidence its conclusion should not be disturbed.