STAHL EQUITIES CORP., Appellant, v PRUDENTIAL BUILDING
MAINTENANCE CORP., Respondent.

First Department, August 4, 1983

#### APPEARANCES OF COUNSEL

*Ralph L. Ellis* of counsel (*Milton S. Gould, Fran M. Jacobs* and *Kenneth S. Grossman* with him on the brief; *Shea & Gould,* attorneys), for appellant.

*Jay G. Strum* of counsel (*Mark C. Zauderer* and *David N. Ellenhorn* with him on the brief; *Kaye, Scholer, Fierman, Hays & Handler* and *Stein, Zauderer, Ellenhorn, Friedman & Kaplan,* attorneys), for respondent.

#### OPINION OF THE COURT

ASCH, J.

Plaintiff is the owner and landlord of the 1.5 million square feet office building at 277 Park Avenue. Defendant

provided plaintiff with cleaning services for said building and billed for the period from January 1, 1965 until late 1973. At that time defendant terminated its contract. This action was instituted on November 5, 1973, plaintiff alleging that it had been overcharged for the period between January, 1965 through June, 1973. Defendant promptly counterclaimed seeking sums alleged due for services rendered between June, 1972 and December, 1973. The case did not come on for trial until November 17, 1982. By this time, more than 18 years had passed since the negotiation of the contract.

At the outset of the trial, it became clear that plaintiff landlord would press only two claims, somewhat at variance with those asserted in its complaints. No opposition was raised by the court. One cause was based on fraud in the inducement of the contract, asserting that defendant had misrepresented that 113½ employees would be needed to perform the cleaning services described therein; that the contract price had been predicated on this representation; and that defendant had actually employed an average of only 83 workers after the building was fully occupied. The second cause was based on breach of contract in calculating defendant's right to escalation payments. This claim was for the difference between the escalation increases defendant had actually charged, calculated upon 113½ workers, and the escalation plaintiff landlord argued defendant was entitled to under the contract, calculated only upon the 83 workers who actually rendered the services in the building.

In accordance with statements to the court by landlord's counsel, the facts supporting plaintiff's claims were as follows: landlord, never having operated a building of this size, in early 1963 solicited bids for a fixed price cleaning service contract for all floors of the building above the fifth floor, while the building was still being constructed. The fixed price of the cleaning contractors' bids was to be based upon a proposed staffing schedule, or so-called "manning tables". It was the manning tables which were the key to the bidding, as all bidders employed union workers, paid at the same rate. Landlord had made it known that it wanted a fixed price contract at 20% *less* than the vendors' labor

costs, as calculated upon the manning tables to be submitted with the bids, even if cleaning the building required additional workers. Such a below cost contract was a realistic possibility since the cleaning service vendor awarded the building contract was thereby in a position, merely by having workers on the premises, to obtain all extra cleaning services tenants wished to have performed. In addition, the cleaning services for Chemical Bank, which was to occupy the lower five floors of the building, could be performed by the same employees. The tenants' extras and the Chemical Bank cleaning service contract represented the margin which would enable the contractor to cover its costs on this contract and make a profit overall.

In a letter of April 7, 1964, defendant set forth a manning table for both the period from the start-up of the building until total occupancy (27½ workers) and for the period after total occupancy (113½ workers). The cover letter thereto stated, "[W]e herewith enclose our breakdowns for basic personnel that will be required in the building upon its occupancy and upon total occupancy."

A 35-page contract was ultimately negotiated and, in May, 1964, executed. Under paragraph 7, the contractor received a fixed price: for the start-up period, now defined as lasting until the space above the fifth floor was 80% occupied, approximately $15,000 per month with an additional 2 cents per month for each square foot occupied; and for the period after such space was 80% occupied, approximately $35,000 per month. More formalized manning tables for both the start-up period, and the post 80% occupancy period, were attached to the executed contract as exhibits. They were referred to in provisions of the contract, particularly the escalation provisions, but not in paragraph 7 which fixed the price. Paragraph 3 of the contract stated: "All of the Services shall be performed by the Contractor to the satisfaction of the Owner", while paragraph 4 (a) stated: "4. (a) At all times while the performance of any of the Services is in progress, the Contractor shall have supervisors and/or foreladies in charge, and at the site, of performance as may be reasonably required by the Owner. The number of workmen engaged in such performance shall at all times be suffi-

cient for the due performance of the Services at the times and in the manner herein provided and shall not be limited by the specifications of 'Basic Personnel Complement' and 'Normal Personnel Complement' set forth in Exhibits B and C annexed hereto."

Plaintiff landlord maintained that defendant's utilization of 83 workers in the building even upon complete occupancy, 30½ workers less than that set forth in the manning tables, was proof of defendant's knowing misrepresentation, at the time the contract was negotiated, as to the number of employees likely to be needed in providing the cleaning services, and that landlord had relied on the contractor's representation, set forth in the manning table, in setting the fixed price of the contract in paragraph 7.

It should be noted plaintiff's claim was *not* that the manning table constituted a warranty that 113½ employees would be engaged, and that defendant contractor by employing fewer workers breached the contract. The claim was essentially that defendant's estimate was made in bad faith, indeed known at the time to be false.

Paragraph 8 of the contract provided for adjustment to the contractor's fixed price for increases and decreases in the contractor's labor costs. The key provision in dispute is paragraph 8 (c), which provides:

"(c) Notwithstanding anything to the contrary provided in Subparagraphs (a) and (b) above, for the purpose of computing any excess or deficiency pursuant to said Subparagraph (b),

"(i) the Labor Cost of Basic Regular Services shall be deemed to be the Labor Cost for the average number of employees, determined by the average number in each job category, actually engaged over the period of three months preceding the determination date, or the Labor Cost as of such date for the number of employees and in the respective job categories listed in the Basic Personnel Complement annexed hereto as Exhibit C, *whichever is the lesser;* and

"(ii) the Labor Cost of Full Regular Services shall be deemed to be the Labor Cost for the average number of employees, determined by the average number in each job

category, actually engaged over the period of three months preceding the determination date, or the Labor Cost as of such date for the number of employees and in the respective job categories listed in the Full Personnel Complement annexed hereto as Exhibit D." (Emphasis added.)

While paragraph 8 (c) (i) provided that escalation during the start-up period was to be based upon the *lesser* of the average number of workers actually engaged in the building or the number stated in the manning tables, paragraph 8 (c) (ii) applicable to post 80% occupancy time fails to state which of the two alternative formulas applied, the average number of workers actually engaged in the building, which landlord maintains to be approximately 83, or the number stated in the manning tables, in this case 113 1/2. There was no dispute that the contractor had billed landlord for escalation on the basis of 113½, though the contractor admitted such number was never actually engaged. While not accepting landlord's contention that only 83 were employed in the building, defendant admitted that no more than 96 or 97 on average and no more than 100 at any time were ever so engaged.

After hearing these extensive arguments of counsel, the court dismissed the plaintiff's claim for fraud, but found an ambiguity requiring a trial as to the escalation provisions. The court held that the arm's length contract directly contradicted any claim that the manning tables had a binding effect upon the number of employees defendant was to have engaged in the building in that the contract expressly stated the number of workers shall be sufficient for the due performance of services and "shall *not* be limited by" the manning tables (see par 4 [a], *supra*). The contract standard was the quality of services provided, which had to be satisfactory to the landlord, no matter if such performance required more or less than the numbers specified in the manning tables. As to the escalation cost, the court found the contractual language was incapable of interpretation on its face without resort to extrinsic evidence.

A two-day trial, in which two witnesses, the negotiators of the agreement for each party, were heard, was then conducted as to the meaning of the escalation provision.

Paul Landsman, an experienced real estate lawyer, had represented landlord in this transaction and had drafted the executed agreement. The first draft of this agreement was prepared by defendant's lawyer, Rubin Schwartz. It was a three-page document and signed by defendant's vice-president before being forwarded to Landsman, who rejected it as not specific enough. Defendant's proposed agreement clearly provided for escalation based solely on the increased costs for workmen employed in the building. Landsman then set to work on a more comprehensive document, which went through three drafts presented to and negotiated with defendant's layman officer, Alan Powers, before being executed. Each of the three drafts contained the subject ambiguous escalation clause. Landsman essentially testified that he had inadvertently omitted "whichever is the lesser" from paragraph 8 (c) (ii). Landsman (unlike Powers) utilized his contemporaneous notes and memoranda to refresh his recollection as to the relevant events, which, as noted, by the time of trial had transpired 18 years earlier. These notes clearly supported Landsman's testimony. One of them stated, "on actual cost of labor on-job — or required personnel, whichever is lesser." On the other hand, Powers testified that he and Landsman had specifically agreed that after the building was 80% occupied, the contractor would at the minimum get escalation on the 113½ employees specified in the manning tables and upon more employees if more were actually employed.

At the conclusion of the presentation of both parties' cases, Justice GREENFIELD construed the contract favorably to defendant contractor, essentially finding neither witness credible and relying upon plaintiff's failure to meet its burden of proof, the rules of construction of a contract, and the parties' practical construction (i.e., plaintiff landlord's failure to object to defendant's escalation increase statements for nine years). The parties then stipulated as to the amount due on defendant's counterclaims for services rendered, on the basis of the trial court's decision.

The trial court erred in dismissing plaintiff's claim for fraud in the inducement. The court considered plaintiff's offer of proof, as set forth in its trial memoranda and

opening statement and argument, and found them to be insufficient as a matter of law. Though obviously not on written submissions, the court was treating plaintiff's claims, and disposed of plaintiff's fraud claim, in the manner of a summary judgment motion. The court relied on *Danann Realty Corp. v Harris* (5 NY2d 317). In that case, plaintiff, purchaser of a lease on real property, was barred from introducing extrinsic evidence to establish the seller's fraud in the inducement of the transaction, there alleged to be based on misrepresentations as to operating expenses and profits. The sole basis was that the parties' contract included a merger clause in which the seller disclaimed any representations as to operating expenses specifically and any other matter affecting the premises not expressly set forth in the contract. The purchaser acknowledged no such representation had been made and both parties acknowledged they had not relied upon any representation made by the other. The Court of Appeals found that such a clause barred proof of reliance, a requisite element of a claim of fraud. However, in this case the subject agreement has no disclaimer of representations by either side and indeed there is not even a merger clause.

*Danann Realty* (*supra*) is clearly inapplicable and under well-established law plaintiff was entitled to offer parol evidence of fraud in the inducement (see *Millerton Agway Co-op. v Briarcliff Farms,* 17 NY2d 57). *Hertz v Rubin* (31 AD2d 919, affd 27 NY2d 875), and *Charid Props. v Berger* (37 AD2d 987, affd 32 NY2d 667), relied upon by defendant herein, are also inapposite. In *Hertz,* a claim of fraud in the inducement based upon a misrepresentation as to the nature of a seller's interest in oil and gas property was dismissed on a summary judgment motion because there was no proof of a specific representation as to the nature of the seller's interest outside of the written contract. The parties' agreement clearly stated the seller's interest to be other than that claimed to have been contained in the alleged misrepresentation. In *Charid Props.* (*supra*) the fraud in the inducement action was dismissed since the alleged misrepresentation involved the seller's interpretation of the rent flowing from the property under a lease. It was deemed a matter of legal opinion upon which the

purchaser could not rely since it could refer to the underlying lease itself. In the case before us, on the other hand, plaintiff claims defendant knowingly and grossly misled it as to the number of employees which were needed to clean the building, a factor to which the contract price was, in view of the parties' negotiations, clearly dependent.

Further, defendant's contention that the matter may be disposed of as a matter of law on the basis that any statement by defendant as to staffing requirements was a mere matter of opinion and expectation and therefore cannot form the basis for a fraud action is without merit. If defendant did not believe or intend, at the time of entering into the contract, that the tables were accurate, the representation would be clearly actionable (*Chase Manhattan Bank, N. A. v Perla,* 65 AD2d 207).

The refusal to hear evidence on plaintiff's cause of action for fraud in the inducement was particularly inappropriate since the subject matter was intimately intertwined with the significance and meaning of the escalation provisions of the contract.

The dismissal of the fraud in the inducement and negligent misrepresentation claims unfairly prejudiced plaintiff at the trial. The trial court effectively prevented plaintiff from presenting evidence which would have borne on the credibility of the parties' witnesses, the business setting in which the agreement arose, and the meaning and purpose of paragraph 8 (c) (ii).

Accordingly, the judgment of the Supreme Court, New York County (EDWARD GREENFIELD, J.), entered December 17, 1982, after a nonjury trial, which dismissed plaintiff's complaint and awarded defendant judgment in the amount of $1,232,279.93, including interest, costs and disbursements, on its counterclaim, should be reversed, on the law and the facts, to the extent of striking the dismissal of plaintiff's complaint, and the grant of judgment to defendant upon its counterclaims, reinstating plaintiff's causes of action for fraud in the inducement and breach of contract for payment of incorrect escalation charges, and remanding for a new trial, with costs and disbursements to abide the event.

KUPFERMAN, J. P. (dissenting in part). Although I agree with the majority that the breach of contract cause of action alleging miscalculation of escalation charges should be remanded for a new trial, I would affirm the dismissal by Trial Term of the cause of action alleging fraudulent inducement of the entire contract.

The facts are well stated in the majority opinion. The central issue is construction of an ambiguous escalation clause in the cleaning service contract executed by the parties. That clause provides: "(ii) the Labor Cost of Full Regular Services shall be deemed to be the Labor Cost for the average number of employees, determined by the average number in each job category, actually engaged over the period of three months preceding the determination date; or the Labor Cost as of such date for the number of employees and [sic] in the respective job categories listed in the Full Personnel Complement annexed hereto as Exhibit D." The immediately preceding paragraph 8 (c) (i) in the contract, which governed escalation during the period when the building was not yet fully occupied, was phrased identically to paragraph 8 (c) (ii) quoted above, except it ended with the words, "whichever is the lesser". Clearly, paragraph 8 (c) (ii) as written is incomplete.

The "Full Personnel Complement" referred to above lists the requirements of personnel to serve the entire building at 113½ people. It is conceded that the actual number of personnel employed to service the building was substantially lower.

However, the estimate of 113½ people was not a fraudulent misrepresentation made to induce plaintiff to enter the contract. Rather, it was an approximate figure. The building was not even fully occupied when the 113½ estimate was given, and defendant had never before serviced a building so large.

In my view, the only logical construction to be given to the ambiguous clause is that the words "whichever is lesser" were inadvertently omitted. Applying this interpretation, the 113½ figure becomes the maximum number of employees on which defendant can charge escalation under the terms of the contract, with the actual escalation

charges to be based on the actual number of personnel employed. It was perfectly reasonable for plaintiff to assume that defendant was actually using more than 113½ employees when the bills came in year after year charging escalation on the basis of 113½. It is inconceivable that a landlord would agree that escalation charges in a service contract would be based on the salaries of nonexistent employees.

Ross, J. (dissenting). I would affirm.

Plaintiff Stahl Equities Corp. is the landlord of 277 Park Avenue, Manhattan, which is a 52-story office building. In 1964, plaintiff entered into a contract with defendant Prudential Building Maintenance Corp., by which defendant provided the subject building with cleaning, maintenance and janitorial services above the fifth floor. For nine years the defendant performed these services, under the supervision of the plaintiff's on-premises managing agent, Cross & Brown. It is undisputed that at no time, during the life of the contract did the plaintiff complain about defendant's performance. The written agreement was negotiated at arm's length by experienced businessmen. In 1973 the defendant exercised its right to give notice of termination. Subsequent to termination, plaintiff commenced the instant action against defendant for: (1) breach of contract and (2) fraud and negligent misrepresentation. In its answer, defendant counterclaimed for breach of contract and account stated.

After a nonjury trial, Trial Term dismissed plaintiff's claims against defendant and found in favor of the defendant on its counterclaims, which were based upon unpaid invoices for services rendered.

The key issue in this case is the intention of the parties, as expressed in their more than 30-page agreement, which was drafted by the plaintiff's very experienced real estate attorney. The determination of that intent depends upon the credibility of the witnesses. My review of this record leads me to conclude that "[i]n a case so close as this, let the court of first instance decide. Face to face with living witnesses the original trier of the facts holds a position of advantage from which appellate judges are excluded. In

doubtful cases the exercise of his power of observation often proves the most accurate method of ascertaining the truth" (*Boyd v Boyd,* 252 NY 422, 429).

It is difficult for this writer to perceive that it took the plaintiff, who is a very knowledgeable real estate operator, nine years to realize that it was a victim of overcharging.

This writer further notes that plaintiff did not institute this action until after the defendant canceled the contract, as was its right, and demanded payment in the amount of approximately $300,000 for services rendered to plaintiff at another building located at 22 East 40th Street.

SANDLER and ALEXANDER, JJ., concur with ASCH, J.; KUPFERMAN, J. P., dissents in part in an opinion; ROSS, J., dissents in a separate opinion.

Judgment, Supreme Court, New York County, entered on December 17, 1982, reversed, on the law and the facts, to the extent of striking the dismissal of plaintiff's complaint, and the grant of judgment to defendant upon its counterclaims, reinstating plaintiff's causes of action for fraud in the inducement and breach of contract for payment of incorrect escalation charges, and remanding for a new trial, with costs and disbursements to abide the event.