OLGA IRIS PÉREZ, Plaintiff and Appellant, *v.* JOSÉ ACEVEDO QUIÑONES, Defendant and Appellee.

No. R-69-118.     Decided October 20, 1972.

*Néstor A. Rodríguez Escudero* for appellant. *José Veray, Jr.,* for appellee.

MR. JUSTICE HERNÁNDEZ MATOS delivered the opinion of the Court.

The Superior Court, Aguadilla Part, rendered judgment dismissing the complaint brought by Olga Iris Pérez against her father, José Acevedo Quiñones, in an action of filiation.

Plaintiff's evidence consisted of her testimony and that of her mother, Gregoria Pérez Moreno.

Gregoria testified that she lives in the Ward Ensenada of Rincón since she was born; that in April 1942 she started to live as husband and wife with defendant, and as a result of these relations, a girl was born to her on February 8, 1943, who is the plaintiff Olga Iris Pérez; that defendant helped her for the childbirth, giving her money for the midwife and after the girl was born, she and the defendant continued their relations until she started asking him for his name for her daughter, then he went away; that when defendant thought that she had forgotten "that" he came back to "make the rounds" of her house and he always helped the girl by giving her money to dress her.

She also stated that when she started to live with defendant, she had been alone for four years and during the time she lived with him she did not live with any other man; that he visited her two or three times in the week at her house, where she lived with her other children and where they had sexual relations. Upon being asked whether she had any doubt as to the fact that plaintiff is the daughter of the defendant, she answered: "why am I going to have a doubt, she is indeed my daughter, she was born from me and from Mr. José Acevedo, why am I going to have a doubt."

In cross-examination she testified that she has eight children; plaintiff; five children from her marriage with Miguel Martínez; and other two born from her relations with Alfredo Guay, with whom she lived without getting married in 1937 and in 1939. The two children she had with Guay are acknowledged.

She knew José Acevedo Quiñones since she was about ten years old. He was already married with a woman called Sara. It was not until April 1942 that she started to live with him, becoming pregnant at about the month of May of that year. Her midwife was Juana Bonet, who at the time of the hearing had been dead for about three years.

Ever since the girl was born she started to ask him to give his name to the former. He became angry and went away, but later he came back and they continued their relations. She did not bear any more children of the defendant, since after the birth of the girl they used contraceptives. When Olga Iris was about three and a half years old, she filed an action against him. In 1947 when the girl was about four years old, since she continued asking him to give his name to the girl, the defendant "became angry" and left for good. When plaintiff was six years old, she started to go to school and the defendant supported her. By that time she told her daughter that the defendant was her father, "when she had understanding, that she could understand."

At the time of the trial her other children were in New York. Although her neighbors knew that the defendant lived with her, they did not appear to testify because "they are dead and others are abroad and the one who was going to come is suffering from asthma and for that reason he could not come."

Plaintiff testified that at the time of the trial she was married, she was 26 years old, and she lived in the Ward Ensenada of Rincón; that she lived with her mother, Gregoria Pérez, until the age of fifteen years. She knows defendant and she learned that he was her father since she was six years old; that when her mother took her to school, she saw defendant and told her "look, that is your father"; that she went to the defendant and asked for his blessing; he gave her his blessing and passed his hand over her head; every time she went to town, she saw him and talked with him, she asked for his blessing and he gave it to her; that sometimes she asked him for one or two pennies for candies and he told her: "I don't have now but I'll give it to you tomorrow," and the next day he gave them to her; that once he even gave her three or four dollars for shoes; she never saw him giving money to

other children, only to her. She also stated that when she got married she did not go to him.

In her cross-examination she testified that the last time he gave her his blessing was when she was in the seventh grade more or less, since afterwards she did not ask for it. On previous occasions he took her by the hand when she came out of school and told her: "God bless you and go by the edge so that nothing happens to you." Every time her mother saw defendant she told her to ask for his blessing, that he was her father. She never called him father, and nobody else besides her mother told her that he was her father, but she remembers that when she was a little girl the defendant went always to her house.

The defendant José Acevedo Quiñones, citizen of Rincón, testified that he knew plaintiff and Gregoria. He denied that Olga Iris was his daughter and that he had ever lived with Gregoria, that he never gave his blessing to plaintiff nor has he given her money; that in 1947 Gregoria filed a complaint against him for abandonment of minors and he was acquitted and that since the time of the trial, neither the plaintiff nor her mother have requested him to recognize her.

In the cross-examination he testified that he lives at Sol Street in Rincón which is adjacent to the Ward Ensenada, where Gregoria lives. They live about three kilometers one from the other. He was engaged in agriculture and business. He had his property about 15 or 20 hectometers from Gregoria's house. He knew exactly where she lived and that they called her "Goya." He does not know why it occurred to Gregoria to file a complaint against him in the District Court, for Abandonment of Minors. Since they lived in the same ward he talked to her and "since I knew her, it is possible that sometime she went by and said hello or how are you." He never stopped at her house for he was always at his business. In 1942 he closed at 6 p.m. and he remained there keeping accounts. At nine o'clock in the nighttime he was in bed in his

house. He did not go out since he has always been a home-loving man. He has ten children and has been married three times.

In his findings of fact the trial judge states that plaintiff's evidence was not satisfactory since there was no corroboration whatsoever of Gregoria's testimony on the alleged concubinary relationship with the defendant, and that the witness having admitted that the sexual relations between both were sporadic and that the same took place in her own home where she lived with her seven children none of said children appeared to testify, it being alleged that all are residents of New York City.

The fact that Gregoria waited until her daughter was four years old to file the criminal action when, according to her own testimony, the defendant "went away," when she asked him to give his name to the girl and only occasionally did he give her $3.00 or $4.00 for the latter's clothing and shoes proved to be "significant" for the trier.

The trial judge gave great weight to the fact that the action of filiation was brought twenty-one years after defendant's acquittal in the case of Abandonment of Minors. Lamentably he was confused as to who was plaintiff in the case. In the fourth finding of fact he states thus: "4—The instant Action of Filiation was brought twenty-one years later. The cause of the delay was not explained. In the cross-examination the defendant [sic] admitted that many of the neighbors who were supposed to have knowledge of the concubinary relationship between the former and the defendant had died. That included the midwife who took care of the birth of her daughter, to whom it is alleged that the defendant had given money for said childbirth, and who died three years ago."

"Plaintiff as well as her daughter have lived during most of their lifetime in the town of Rincón, Puerto Rico, and there has not been any obstacle whatsoever for failing to exercise the instant action on a previous date."

He concludes that "In the instant case plaintiff's paternity has not been satisfactorily proved, the court granting full credit to defendant's testimony."

■ Since *Ocasio* v. *Díaz*, 88 P.R.R. 658 (1963), all that is required to make a judicial declaration of the status of a child is the establishment of the fact of natural or biological paternity, regardless of the date or other circumstances of the birth, it being sufficient that the paternity be satisfactorily proved under the usual rules of evidence, pursuant to the preponderance of the evidence, and in conformance with the findings which, taking into consideration the attendant circumstances of the case, represent the most rational, just, and juridical balance in the determination of the case.

■ It is a basic rule of the Law of Evidence that the direct evidence of a witness who is entitled to full credit is sufficient for proof of any fact. To dismiss the complaint the trial judge granted full credit to defendant's testimony and considered that the plaintiff had not satisfactorily proved the paternity. From his findings it evidently comes forth that the circumstances which thus inclined his thought were: (a) his solid and positive opinion, expressed in juridical terms and sense, that the corroboration of Gregoria's testimony was necessary; (b) his holding that the filiation was untimely and (c) his apparent confusion as to who was the plaintiff; the sporadic sexual relations between Gregoria and the defendant; the delay on the part of the mother to wait until her daughter was four years old to file a complaint against defendant for abandonment of minors, and after the complaint, the twenty-one year delay to bring the instant action; the fact that the defendant occasionally gave only $3.00 or $4.00 to the girl for clothing and shoes; and, that the defendant was a successful businessman of the locality and Gregoria did not have any other possessions.

■ Precisely all this is what inclines us to believe in the simple and honest testimony of Gregoria and her daughter, more than in that of defendant. First of all we must consider that the law, as we mentioned above, does not require corroboration of the witnesses' testimony in this case. Gregoria's sole testimony is sufficient to prove the paternity.

Then we must consider that the complaint was not filed by Gregoria, but her daughter. The latter is the one entitled to file a complaint claiming her filiation. Plaintiff did not file the complaint untimely since § 126 of the Civil Code provides that the actions for the recognition of natural children can only be exercised during the life of the presumptive father, or a year after his death. The fact that she waited twenty-one years after her mother filed a complaint against her presumptive father for abandonment of minors has nothing to do with it. Plaintiff should not be penalized for the actions of other persons. The complaint is hers, not of her mother and she filed it on time. She did not have to give any explanations as to why she decided to file a complaint when she did.

■ She cannot be prejudiced either by the fact that Gregoria waited until she was four years old to file a complaint against her presumptive father for abandonment of minors. In the first place, at law, this complaint of 1947 has nothing to do with the action of filiation of 1968 and, in the second place, this bare fact should not necessarily imply adverse suspicions on the paternity. This case in particular arose when the girl was four years old. According to Gregoria's testimony it was by that time that the defendant-father went away for good, and it is not illogical to assume that once disengaged from the mother he forgot his obligation towards his daughter.

From the record it clearly appears that in the weighing of plaintiff's evidence the trial court acted on the basis of appraisal views adverse to plaintiff and evidently erroneous; however, with regard to the testimony of the defendant

father, it did not do the same. Though it stated that it gave full credit to such testimony, it did not say that it refused to give credit to those given by plaintiff and by her mother. Necessarily, in the instant case, we do not have to understand, also, that it did not believe them. Probably it did not give them any probative value whatsoever because: They were not corroborated and the case involved an action of filiation brought "twenty-one years after [the criminal case of abandonment of minors] and the cause of the delay was not explained."

■ As a general rule, we do not disturb the findings of fact of the trial court based on oral testimony. But our reviewing mission is not confined to the errors in proceeding (procedure) or of law only, but, as § 1 of the Act of March 12, 1903 (4 L.P.R.A. § 36) reads, we may "also take cognizance of all the facts and proceedings in the case as they appear in the record, and likewise consider merits thereof, so as to promote justice and right and to prevent injustice and delay."

In order to prevent further delay in this action of filiation we consider that the fairest thing to do is to render the judgment which should have been rendered by the trial court.

In the light of all the attendant circumstances in this action of filiation, principally the preponderance of the evidence in favor of plaintiff—without there being any legal necessity of corroboration of testimonies in these cases—we conclude that in the same it was satisfactorily and sufficiently established that plaintiff Olga Iris Pérez is the daughter of defendant José Acevedo Quiñones, born from his sexual relations with Gregoria Pérez Moreno.

Wherefore the judgment appealed from will be reversed and, in its stead, we will render another sustaining the action of filiation exercised with the other proper pronouncements.

Mr. Justice Dávila, with whom Mr. Justice Rigau, Mr. Justice Ramírez Bages, Mr. Justice Torres Rigual, and

Mr. Justice Martínez Muñoz joined, concurred in a separate opinion.

Mr. Acting Chief Justice Pérez Pimentel dissented without opinion. Mr. Justice Martín, with whom Mr. Acting Chief Justice Pérez Pimentel concurred, dissented in a separate opinion.

—O—

MR. JUSTICE DÁVILA, with whom MR. JUSTICE HERNÁNDEZ MATOS, MR. JUSTICE RAMÍREZ BAGES, MR. JUSTICE TORRES RIGUAL, and MR. JUSTICE MARTÍNEZ MUÑOZ join, concurring.

San Juan, Puerto Rico, October 20, 1972

I have concurred in the decision which reverses the judgment rendered by the trial court because the latter upon weighing the evidence used some criteria which this Court had never required in these cases: the need to corroborate the evidence which establishes the paternity. See *Ortiz* v. *Viera*, 61 P.R.R. 495–496 (1943). When this Court reversed the doctrine which required "strong and convincing" evidence in these cases, it threw overboard the obstacles which the case law had established against those who claimed the acknowledgment of the paternity. The "establishment of the fact" of which we spoke in *Ocasio* v. *Díaz*, 88 P.R.R. 658 (1963), does not have the scope which the dissenting opinion seeks to give to it, apparently trying to revive doctrines already abandoned by this Court. It is not correct to juxtapose the concept of "corroboration" which the trial judge used with that of "establishment of the fact of paternity" to which we referred in the *Ocasio* case. What *Ocasio* left clearly established is that the only thing required is that the "paternity be satisfactorily proved under the usual rules of evidence."

—O—

Mr. Justice Martín, with whom Mr. Acting Chief Justice Pérez Pimentel concurs, dissenting.

San Juan, Puerto Rico, October 20, 1972

I dissent from the opinion issued by the Court today in the instant case. The doctrine established in the case of *Ocasio* v. *Díaz*, 88 P.R.R. 658 (1963), cited by the Court in its opinion today and by the trial judge in his conclusions of law, is as follows:

"Any judicial declaration of the status of child shall be based on the establishment of the fact of natural or biological paternity, regardless of the date or other circumstances of birth, it being sufficient that the paternity *be satisfactorily proved* under the usual rules of evidence, pursuant to the preponderance of the evidence, and in conformance with the findings, which, taking into consideration the concurrent circumstances of the case, represent the most rational, just, and juridical balance in the determination of the case." (Italics ours.)

Applying the juridical rule of the *Ocasio* case the trial judge concluded as a question of fact that the establishment of the fact of paternity was not satisfactory. And, for that reason, he said that plaintiff's evidence which he had before him did not satisfy him. He refers to the testimonies of plaintiff and her mother. The evidence heard, as a whole, makes me think that the trial judge found that Gregoria's evidence should have been strengthened because he was not convinced by the evidence which he had before him. The drafting of the findings of fact is not the most fortunate, but from all of them as a whole I cannot but conclude that when the trial judge says that "There is no *corroboration* whatsoever of Gregoria's testimony about the alleged concubinary relationship with the defendant," he refers to the *establishment* of the fact of paternity to which the *Ocasio* case refers. (Italics ours.)

In making his conclusions of law the trial judge himself sets forth the rule of the *Ocasio* case which permits that the paternity be satisfactorily established under the usual rules of evidence. According to the Law of Evidence the direct evidence of a witness who is entitled to full credit is sufficient for proof of any fact. 32 L.P.R.A. § 1661. The premise on which the aforesaid provision is based is that the witness should deserve the trier's full credit. The evidence does not have to be strong and convincing as we have said before. *Sanabria v. Heirs of González*, 82 P.R.R. 851 (1961). But, it should be believed. And, in this instant case the trial judge believed the defendant.

An analysis of the testimony of said defendant and of those of plaintiff and her mother reveals that the former is unreconcilable with the latter. When the court gave full credit to defendant's testimony it rejected those of plaintiff and her mother. It would be absurd to request it to make a pronouncement as to the credibility which the latter deserved, since it could not believe at the same time the contradictory versions of both parties, one being the denial of the other. The trial court settled then the conflict of the evidence against the plaintiff applying the rule of the *Ocasio* case.

We repeat, as we have done in the past, the clear provisions of Rule 43.1 of the Rules of Civil Procedure:

". . . Findings of fact based on oral evidence shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. . . ."

A finding is "clearly erroneous" when even though there is evidence to support it, the appellate court, based on the totality of the evidence, remains with the firm and true conviction that an error has been committed. See *United States v. Gypsum Co.*, 333 U.S. 364, 395 (1947); *McCallister v.*

*United States,* 348 U.S. 19, 20 (1954) ; 5A Moore's *Federal Practice,* par. 52.03, 2d ed. 1971.

The findings of the trier in the instant case are not clearly erroneous nor arbitrary and they have sufficient support in the evidence believed by the trial court. Neither is it established that there has been passion, prejudice or partiality. *Rodríguez* v. *Concreto Mixto, Inc.,* 98 P.R.R. 568 (1970).

In a case of a different nature from the one at bar, the Court of Appeals of New York makes some statements which we may adopt to support the reason which underlines our Rule 43.1, to wit:

". . . Face to face with living witnesses the original trier of the facts holds a position of advantage from which appellate judges are excluded. In doubtful cases, the exercise of his power of observation often proves the most accurate method of ascertaining the truth . . . . How can we say the judge is wrong? We never saw the witnesses. . . . To the sophistication and sagacity of the trial judge the law confides the duty of appraisal." *Boyd* v. *Boyd,* 252 N.Y. 422, 169 N.E. 632, 634.

The situation raised in the instant case does not justify the broadening of our doctrine in the actions of filiation.