In the Matter of the Estate of MARY BARC, Deceased.

Surrogate's Court, Kings County, November 17, 1941.

*Blum & Jolles* [*Joseph G. Blum* of counsel], for the Consul General of the Republic of Poland, appearing on behalf of Leonard Barc, husband of deceased, objectant, for the motion.

*J. Justin Franco*, for Nellie Fus, as administratrix, etc., petitioner, opposed.

*William Rosenzweig*, special guardian for Theresa Huffman, infant daughter of deceased distributee, opposed.

*Bernard Davis*, for Edward Wysocki, creditor.

WINGATE, S. The trial of the issues in this proceeding has been conducted with wholly unjustified personal acrimony between the opposing counsel and the record has been cumbered by a plethora of irrelevant and wholly worthless testimony, which has disclosed a sordid story, perhaps unavoidable under the circum-

stances since the controversy amounted in substance to the trial of a posthumous matrimonial action.

The issues concerned the asserted forfeiture by the husband of the decedent of his right to share in intestacy in the net avails of her estate by reason of the inhibitions contained in section 87 of the Decedent Estate Law, which provides that "no distributive share of the estate of a decedent shall be allowed under the provisions of this article * * * (c) * * * to a husband who has neglected or refused to provide for his wife, or has abandoned her * * *."

The opponents of the husband assert the presence of both disqualifying conditions. Since the initial marriage of the parties was conceded, the burden was imposed upon them of demonstrating either that he abandoned the decedent within the strict legal connotation of the term or that he breached the obligation ordinarily imposed by law upon a husband to support his wife. That this burden of proof rested upon his opponents appears to be conceded by them, but is well established in any event. (*Matter of Maiden*, 284 N. Y., 429, 432; *Matter of Dugro*, 261 App. Div. 236, 240; *Matter of McGlone*, 171 Misc. 612, 615; affd., 284 N. Y. 527; *Matter of Rechtschaffen*, 278 id. 336, 338; *Matter of Clare*, 262 App. Div. 773; *Matter of Quick*, Id. 808; *Matter of Chandler*, 175 Misc. 1029, 1031; *Matter of Lawson* [*Larson*], 158 id. 902, 904.) It extends to all of the essential elements of both asserted varieties of dereliction.

Before entering upon a review of the evidence actually presented on the hearings it will be of advantage to recall the demonstrations which must be adduced to establish "abandonment" within the connotation of the statute and as to the situations in which a failure to support a wife will be deemed sufficient in the eyes of the law to warrant a denial of the normal and customary rights of inheritance by a husband.

Of course, in the demonstration of an abandonment, proof is essential that there was a departure by the allegedly abandoning spouse from the one asserted to have been abandoned. This, however, standing by itself is insufficient. "To constitute abandonment under this statute something more is necessary than a departure from the marital abode or a living apart. It is argued, however, that a *prima facie* case of abandonment is established by showing the departure from the marital home followed by the spouses living separately. To amount to abandonment the departure of a spouse from the marital home must be unjustified and without the consent of the other spouse. The reason for leaving is inseparable from the act. Human relations between spouses are so complex and influenced by so many circumstances, separa-

tions occur in so many instances with fault and without fault, with consent and without consent that we deem the conclusion of fault on the part of the person leaving the joint home too uncertain for inference alone." (*Matter of Maiden*, 284 N. Y. 429, 432, 433.)

The result of this pronouncement by the ultimate appellate authority of the State clearly establishes the rule that in order to attain a determination that a surviving spouse has forfeited the right to elect against the will of a decedent spouse under subdivision 4 of section 18 of the Decedent Estate Law, or to participate in the intestate inheritance of his estate under subdivision (c) of section 87, by reason of alleged abandonment, those contending for such a result must demonstrate, *first*, that departure from the other spouse actually occurred; *second*, that it was without the consent of the one left behind; and, *third*, that it was " unjustified," in other words, that it did not occur in consequence of the fault of the person abandoned.

This conclusion appears further to be fortified by the additional statement in the *Maiden* case (*supra*, 432) that the purpose of the Legislature in these enactments was " to exclude from the benefits of the statute " a spouse " against whom a judgment of separation could be sustained under section 1161 of the Civil Practice Act " equivalently stated, in order to warrant a determination that the elective or intestate rights of a surviving spouse have been forfeited the evidentiary demonstration tendered by his opponents must be the equivalent of that which would be required from the wife, were she still alive, in order to warrant the grant to her of a decree of judicial separation. (*Matter of Kellas*, 256 App. Div. 425, 427; *Matter of Green*, 155 Misc. 641, 645; affd., 246 App. Div. 583; *Matter of Fingerlin*, 167 Misc. 770, 772; Butler, N. Y. Surrogate Law & Practice, §§ 2297.)

The demonstrations requisite to establish abandonment within the connotation of the statute have been reviewed. Those required to prove a violation of a husband's usual obligation to support his wife remain to be explored.

The obligation of a husband to support his wife is only at his own home (*People ex rel. Commissioners of Charities* v. *Cullen*, 153 N. Y. 629, 635; *People* v. *Schenkel*, 258 id. 224, 226; *Matter of Roessler*, 171 Misc. 306, 308; *Matter of Wagner*, 174 id. 203, 205) and in accordance with his means. (*Garlock* v. *Garlock*, 279 N. Y. 337, 340; *Keller* v. *Phillips*, 39 id. 351, 354.) Even to this limited extent, his duty in this regard is non-existent where the wife has herself breached her marital obligations (*Mirizio* v. *Mirizio*, 242 N. Y. 74, 82; *Matter of Roessler*, *supra*, 308; *Matter of Wagner*, *supra*, 205), in which connection it has repeatedly been decided

that any liability for support on the part of the husband is definitely terminated by the adultery of the wife. (*Hawkins* v. *Hawkins*, 193 N. Y. 409, 411; *Deisler* v. *Deisler*, 59 App. Div. 207, 216; *Doe* v. *Roe*, 23 Hun, 19, 26; *Goldsmith* v. *Goldsmith*, 151 Misc. 198, 199; *Roth* v. *Roth*, 77 id. 673, 676.) Obviously, by application of the principle *volenti non fit injuria*, a husband may not be deemed in default in the performance of this customary marital obligation, if the general conduct of the parties indicates that the wife did not look to the husband for support (*City Bank Farmers Trust Co.* v. *Miller*, 163 Misc. 459, 468; affd., 253 App. Div. 707; revd. on other grounds, 278 N. Y. 134; *Matter of Chanler*, 175 Misc. 1029, 1034; *Manufacturers Trust Co.* v. *Gray*, 278 N. Y. 380, 387; *Matter of Wagner*, 174 Misc. 203, 205) as where they have separated by mutual consent. (*Manufacturers Trust Co.* v. *Gray, supra; Matter of Roessler*, 171 Misc. 306, 309. See, also, *Swanton* v. *Curley*, 273 N. Y. 325, 329; *Matter of Schnirman*, 167 Misc. 809, 814.)

By way of summary on this phase of the issues, it may, therefore, be said that the elective rights of a husband against the will of his wife, or his rights of inheritance in intestacy may not be determined to be forfeited by reason of his non-support of the decedent unless it be demonstrated by his opponents, *first*, that he, in fact, failed to support her; *second*, that he possessed the means from which to furnish support; *third*, that the wife had not been guilty of misconduct exonerating him from any obligation to support her; and *fourth*, that the wife looked to him for support or desired it from him.

With this legal background, the disclosure of the record adduced on the several hearings will be examined. Six witnesses were called on behalf of the administratrix who, whereas not a statutory distributee, abandoned her natural and proper attitude of a disinterested stakeholder and took up the cudgels against the husband. Three witnesses testified on his behalf. It may be noted at the outset that the witnesses on both sides exhibited considerable vagueness and contradiction among themselves respecting dates and times of occurrences. This is quite comprehensible in view of the fact that, so far as the husband was concerned, they had transpired twenty years or more previously.

The witnesses who testified on behalf of the administratrix were the administratrix herself, who was a sister of the decedent, the husband of the administratrix, her two brothers-in-law, one of whom definitely admitted to illicit relations with the decedent, and two friends, called on the last day of the hearings, whose testimony related chiefly to dates of occurrences and was so contradictory in this regard of that of all of the other witnesses on both

sides as to lead to the conclusion that it was based on faulty recollection. Even if true, however, it was totally immaterial in view of the determinations in *Doe* v. *Roe* (*supra*) and *Hawkins* v. *Hawkins* (*supra*).

The composite demonstration of the witnesses on behalf of the administratrix was that in 1920 the decedent and her husband, who were of Polish origin, lived and conducted a grocery store at a given address on North Fourth street, in Brooklyn. They had no children. At some time during that year, or early in 1921, the husband sold the store and thereafter left for Poland, never to return. After his departure, the decedent lived for a few months at 130 North Fourth street and then took a furnished room on Wythe avenue, where she resided for from a year and a half to two years. Prior to the husband's departure, the wife had met a man named Harry Huffman, who was a brother of the husband of one of her sisters. On September 25, 1922, she had a child upon whom she bestowed the surname of Huffman, by which the infant has ever since been known. Harry Huffman testified in this proceeding that he lived with the decedent as husband and wife, and the husband of the administratrix stated that the decedent had admitted to her mother-in-law in his presence that Harry Huffman was the father of her child. After this period of something over two years and up to the time of her death, she resided with the administratrix and her husband.

The only additional potentially relevant testimony tendered on this side of the case was that of the husband of the administratrix and the brother of the admitted paramour who stated that after the husband's departure the latter had said that he was through with the decedent and did not care to live with her any more, and the statements of the administratrix and her husband that the decedent received no support from her husband. Obviously, unless this testimony was pure hearsay, it could only be so far as their personal knowledge was extended, and the husband so qualified it. In any event, it covered merely the period during which the decedent lived with them, which was subsequent to the birth of her child, since neither the administratrix nor her husband visited her during the prior period.

An additional item of testimony deserves a word of passing comment. Over the objection of the counsel for the husband and despite his motion to strike out the testimony after it had been adduced, the administratrix was permitted to state that on his departure, the husband " took all the life savings." This was obviously purely hearsay and was in no wise probative of any issue in the case in any event. Apparently, however, the learned

referee was influenced thereby since at page 7 of his report he states " he took *their* savings with him when he left " (italics supplied), which finding he expands on the second following page to " that he did take with him $4,500 *of hers*." (Italics supplied.) There is not a word of testimony in the record that the money which he took, if in fact he took any, of which there is no competent proof, belonged to the decedent. Since the mind of the referee appears to have been influenced by this improper testimony, its admission must be deemed prejudicial error.

Of the three witnesses who testified on behalf of the husband after counsel for the husband had ineffectually moved for judgment at the close of the administratrix's case, two were wholly disinterested persons and the third was a brother of the husband. The first was a woman who lived in the front of a house immediately in the rear of that occupied by the decedent and her husband prior to the departure of the latter. She testified categorically to witnessing from the windows of her rooms a number of acts of intercourse between the decedent and the paramour which were accomplished in the toilet of the rooms of the husband and decedent, which was about twenty feet distant and that the husband had viewed this action on one occasion shortly prior to his departure. Despite the fact that this testimony appeared wholly disinterested and fits perfectly into the composite picture, the referee has stated his disbelief thereof, predicating it on the fact that the witness voluntarily altered her testimony as to the precise date when the husband witnessed the act. Although the court would hesitate to discount the credibility of the witness on such a ground, particularly in view of the fact that the recollections of all of the witnesses were somewhat uncertain as to the exact time of happening of events which transpired more than twenty years before the trial, it is, too, convinced of the salutary nature of the rule of *Boyd* v. *Boyd* (252 N. Y. 422, 429) and *Matter of Murtha* (259 id. 456, 458) to be willing lightly to adopt a conclusion differing from that of the referee. The testimony will accordingly be eliminated in the composite evaluation.

The husband's brother testified respecting a statement by the deceased to her husband prior to the separation that " you do not satisfy me enough, so I have to get another one," meaning another man. The referee has voiced his lack of credence in the testimony of this witness, wherefore it will be disregarded for like reasons.

The third witness who testified on behalf of the husband was a man who from 1932–1938 was a partner in a grocery business with the decedent. He stated that he had had many talks with

the decedent about her separation from her husband; that she told him she " went out " with the paramour during 1920–1921; that she had lived in a furnished room with him on Wythe avenue under the name of Mary Huffman and that he left her when she was five months pregnant. An extremely significant statement which he attributed to her was that " she was sorry about Mr. Leonard Barc because they let him go; she didn't care when he left, but she realized her mistake after so many years."

Since the testimony of this witness is direct, relevant and apparently disinterested and since the referee has not questioned his credibility it should be included in the composite evaluation of the issue. Even in its absence, however, it must be determined that the opponents of the husband have not sustained the burden which rested upon them of demonstrating misconduct on the part of the husband legally adequate to forfeit his rights to intestate inheritance within the connotation of subdivision (c) of section 87 of the Decedent Estate Law.

Taking up the issue of abandonment and applying the facts demonstrated by the opponents of the husband to the requisite proofs in such a connection, as hereinbefore discussed they have demonstrated that the departure of the husband from the decedent actually occurred. They have not demonstrated that it was without the consent of the decedent. In fact the testimony of the witness last discussed indicates the contrary. The decedent told him " she didn't care when he left." Finally, they have not demonstrated that such departure did not occur in consequence of the fault of the decedent. On the contrary, here again, the last discussed testimony shows an admission on the part of the decedent that the departure was a direct result of her own egregious wrongdoing. It follows that in respect of two of the three essential elements of legal abandonment, not only have the opponents of the husband failed to establish his culpability but the reverse has affirmatively been demonstrated on his behalf.

Turning now to the issue of non-support. There is no competent evidence in the record that the husband failed to support the wife, that he had means for that purpose or that she desired support from him. Even though the testimony of the administratrix and her husband were to be accepted at its full face value, the most that can be said for it is that it indicates failure to support for the period subsequent to 1923. Prior to this time, however, she had been living in open and admitted adultery with another man even according to the testimony of the administratrix's own witnesses. This act effectually destroyed any obligation on the part of the husband for her support, under the unbroken line of authorities

hereinbefore cited. It follows that the husband has not been demonstrated culpable in this regard any more than on the issue of abandonment and that the report of the learned referee must be disapproved and the objection filed on behalf of the husband sustained.

The objections of the administratrix to the testimony of the acts of the decedent subsequent to the abandonment were not well taken. As hereinbefore developed, whereas possessing no probative relevancy on the issue of abandonment, they were relevant on the issue of failure to support.

The contention of the special guardian that the husband must be presumed to be dead by reason of seven years' absence from the State is wholly without merit. (*Matter of Katz*, 135 Misc. 861, 863, 864; *Matter of Sciscenti*, 157 id. 499, 501; *Keller* v. *Stuck*, 4 Redf. 294, 298; *Matter of Feehan*, 145 Misc. 837, 839; *Matter of Zalewski*, 177 id. 384.)

It would be difficult to conceive of any less effective method of attempting to convince a court of the validity of a contention than the launching of acrimonious personal invective of the variety of which counsel for the husband was made the victim in this proceeding. The attempted palliation of this action by the attorney for the administratrix in calling attention to the fact that the special guardian was a participant therein and that he is the " *alter ego* of the surrogate " furnished no excuse and demonstrates merely a fundamental misconception of the office of special guardian. Such an appointee is in no sense a representative or " *alter ego* " of the court and is merely an attorney who is named pursuant to statutory direction to represent a party who is *non sui juris*. When appointed, he acts solely as the attorney for the particular persons whose interests he has been designated to protect. (*Matter of Palestine*, 151 Misc. 100, 104; *Matter of Mackenzie*, 155 id. 822, 825; *Matter of Schrier*, 157 id. 310, 312; *Williams* v. *Empire Woolen Co.*, 7 App. Div. 345, 348; Rules Civ. Prac. rule 42, rule 40, subd. 1; Butler, N. Y. Surrogate Law & Practice, § 431.)

A second issue which was simultaneously submitted to the referee, namely, of evaluating the validity of a claim against the estate, has become academic by reason of its adjustment between the parties.

Enter decree on notice in conformity herewith.