*431 OPINION OF THE COURT
Kristin Booth Glen, S.
The narrow issue before the court is whether Yuko Machida abandoned her husband, Shoichiro Hama, and therefore has forfeited the rights with respect to his estate that would otherwise accrue to her as his surviving spouse (EPTL 5-1.2 [a] [5]). There is also a larger issue, perhaps better directed to the legislature: whether the strict definition of abandonment in the old fault-based Domestic Relations Law is appropriately imported into the EPTL for purposes of determining intestate succession or the right of spousal election.[1] The unusual facts of this case present an opportunity to consider the second issue, while necessarily deciding the first, here, against Machida.
Facts
Machida worked for decedent (familiarly known as Sho) in his design business. They dated, according to Machida, with an understanding that their relationship was not “exclusive.” From late 2004, with Sho’s knowledge, Machida was involved with another man, Travis Klose, with whom she and Sho socialized. Klose moved to Japan in early 2005 and, in May 2005, Machida moved into Sho’s apartment on East 25th Street. In 2006, Sho asked her to marry him, and they were legally married on July 7, 2006.
The reason for the marriage may or may not have been romantic.[2] According to the affidavit of Steven Bromberger, CPA, Sho’s accountant,[3]
“3. Mr. Hama owned a condominium apartment, Unit 26A, located at 43 East 25th Street in Manhattan .... In or around June 2006 I met with Mr. Hama and he told me that he intended to sell his Apartment and asked me what the tax consequences *432 would be. I informed Mr. Hama that there would be a capital gains tax of approximately $60,000 on the sale of his Apartment.
“4. Mr. Hama’s income was in decline and he asked me if there was something he could do to mitigate the capital gains tax on the sale of the Apartment. I suggested in jest that if he were married on the date that the Apartment was sold that he would not have to pay any capital gains tax.
“5. I met Mr. Hama a few weeks later and he informed me that he had married Ms. Yuko Machida, who I knew as an employee of his company, Studio Marz, Ltd. . . .
“6. About two months after his marriage to Ms. Machida, Mr. Hama sold his Apartment on September 6, 2006 ....
“7. In or about November 2006, I met with Mr. Hama and he informed me that he wanted to obtain a divorce from Ms. Machida. I advised him that was a bad idea. Mr. Hama argued that ‘many people get divorced shortly after they get married.’ I answered that no client of mine, who just saved all of the tax that he had saved by being married when he sold his primary residence was getting divorced so quickly. Mr. Hama then asked me how long I felt he needed to stay married and I told him approximately two years.”
In 2007 Sho moved to Japan for medical treatment. Machida, who continued to work for his company, also moved to Japan.[4] There she continued her relationship with Klose, with Sho’s knowledge. In March 2009, according to Machida:
“I registered as husband and wife with Travis [Klose] .... I was feeling pressure from my parents about my relationship with Travis. Registering with him as married relieved some of that pressure. Sho was fully aware of my plan to register as married to Travis .... He even acted as one of the two witnesses to my ‘marriage3 to Travis, signing our marriage certificate and affixing his personal seal, as is the custom with official documents in Japan” (emphasis added).
*433 Despite this “registration” or marriage,[5] Sho unquestionably-considered himself still legally married to Machida and entitled to the benefits that flowed from that marriage, as demonstrated by his accountant’s affidavit, which reads:
“In or around August 2009, Mr. Hama again asked me by email about obtaining a divorce from Ms. Machida. We had been discussing his intention to sell his apartment located at 66 Crosby Street. This property had been the location where his company, Studio Marz, had conducted its business and the company had been paying rent to Mr. Hama. I told Mr. Hama that the apartment at 66 Crosby Street needed to be a strictly a [sic] personal residence for two years and not an income producing property before he could sell it and claim capital gains deductions as a personal residence. I advised Mr. Hama by an email dated August 14, 2009, ‘Regarding the apartment, you need to stay married.’ ”
Sho died intestate in Japan on September 4, 2009, leaving an estate of approximately $1.5 million subject to administration in New York, survived by Machida and by his parents, Sumiko and Matashichiro Hama.
Procedural Posture
On December 4, 2009, Machida, a nonresident alien, petitioned for the issuance of letters of administration to herself and her designee, Michael H. Kane (see SCPA 707 [1] [c]). On January 11, 2010, decedent’s parents, also nonresident aliens, cross-petitioned for the issuance of letters of administration to their designee.[6]
*434 In addition to competing administration petitions, there is a related action commenced by Sho’s parents against Machida and RiverSource Life Insurance Company of New York, which was transferred to this court from Supreme Court, New York County, by order dated November 15, 2010. In that action, decedent’s parents seek a declaratory judgment that Machida is not the default beneficiary of certain death benefits, valued at approximately $350,000, under an annuity agreement between decedent and RiverSource.
On March 31, 2011, Matthew Presseau, the designee of decedent’s parents, filed an amended motion for: (1) an order consolidating the administration proceedings with the declaratory judgment action, and (2) summary judgment dismissing the administration petition of Machida and Kane, revoking the temporary letters that had been issued to Kane, granting letters of administration to Presseau, and declaring that Machida is not a spouse for purposes of decedent’s annuity contract with RiverSource.
On April 20, 2011, Machida filed a cross motion for summary judgment dismissing the cross petition and adjudging Machida to be the default beneficiary of decedent’s annuity contract with RiverSource.
The Motion and Cross Motion for Summary Judgment in the Administration Proceeding
On a motion for summary judgment, the court must view the facts “in the light most favorable to the non-moving party” (Vega v Restani Constr. Corp., 18 NY3d 499, 503 [2012]). Here, with respect to Presseau’s motion for summary judgment (as distinct from Machida’s cross motion), Machida is the nonmoving party. Summary judgment may be granted only in the absence of disputed material facts (id.).
The Law of Abandonment
The applicable statute, EPTL 5-1.2, provides as follows:
“Disqualification as surviving spouse “(a) A husband or wife is a surviving spouse within the meaning, and for the purposes of 4-1.1, 5-1.1, 5-1.1-A, 5-1.3, 5-3.1 and 5-4.4, unless it is established satisfactorily to the court having jurisdiction of the action or proceeding that: . . .
“(5) The spouse abandoned the deceased spouse, and such abandonment continued until the time of death.”
*435 The statute contains no definition of “abandonment,” but historically, the courts have recognized the requirements of the Domestic Relations Law as implicit in the EPTL.[7] That is, “[t]he standard used to determine if a surviving spouse abandoned the decedent is the same standard used to determine whether the party would have been entitled to a decree of separation [or divorce] on grounds of abandonment” (2-32 Warren’s Heaton, Surrogate’s Court Practice § 32.13 [2] [2012]).
As the Court of Appeals wrote more than seven decades ago: “To constitute abandonment under this statute something more is necessary than a departure from the marital abode or a living apart. ... To amount to abandonment the departure of a spouse from the marital home must be unjustified and without the consent of the other spouse.” (Matter of Maiden, 284 NY 429, 432 [1940] [emphasis added]; accord e.g. Matter of Barc, 177 Misc 578 [Sur Ct, Kings County 1941], affd 266 App Div 677 [2d Dept 1943], lv denied 266 App Div 742 [2d Dept 1943].)
Writing of the Court of Appeals decision in Maiden, the Kings County Surrogate wrote:
“The result of this pronouncement by the ultimate appellate authority of the State clearly establishes the rule that in order to attain a determination that a surviving spouse has forfeited the right ... to participate in the intestate inheritance of his estate ... by reason of alleged abandonment, those contending for such a result must demonstrate, first, that departure from the other spouse actually occurred; second, that it was without the consent of the one left behind . . . .” (Matter of Barc, 177 Misc at 581.)
That abandonment must include a lack of consent by the spouse who has been left continues as the law to this day (see e.g. Matter of Morris, 69 AD3d 635 [2d Dept 2010] [even if decedent and the surviving spouse have been living separately for decades, without evidence that the spouse’s departure was without decedent’s consent, there can be no finding of abandonment]). The burden of proof as to abandonment — including lack of consent — is on the party alleging it (Matter of Rechtschaffen, 278 NY 336 [1938]; Matter of Ruff, 91 AD2d 814 [3d Dept 1982]).
*436 On the facts presented here, decedent’s parents cannot meet that burden. Sho’s participation in the “registration” of Machida and Klose’s “marriage” in Japan is the very opposite of “lack of consent” required to disqualify Machida. It is, at the very least, acquiescence in her relationship with another man, however unconventional that acquiescence might be. So long as “fault” — in the sense of harming the marital relationship against the wishes of the other partner — is the test, no such fault can be found here.
Is There an Exception to Maiden and its Progeny?
Decedent’s parents rely, however, on several lower court decisions, including Matter of Bingham (178 Misc 801 [Sur Ct, Kings County 1942], affd 265 App Div 463 [2d Dept 1943], rearg denied and lv denied 266 App Div 669 [2d Dept 1943]), holding that “[t]he court knows of no more convincing evidence of abandonment[8] than the public ceremonial remarriage of the petitioner to another woman in the lifetime of the decedent and his cohabitation with such woman as husband and wife.”[9] (Matter of Bingham, 178 Misc at 805.) They cite also Matter of Goethie (9 Misc 2d 906 [Sur Ct, Westchester County 1957]) and Matter of Khabbaza (174 Misc 2d 82 [Sur Ct, Richmond County 1997]; see also Matter of Henry, NYLJ, May 9, 2012 at 26, col 4 *437 [Sur Ct, Bronx County 2012]). Those lower court decisions are not binding, and, given the holding in Maiden, this court declines to follow them.
The Status and Impact of Oswald
There is one appellate decision which, if not distinguishable, is controlling. In Matter of Oswald (43 Misc 2d 774 [Sur Ct, Nassau County 1964], affd 24 AD2d 465 [2d Dept 1965], affd 17 NY2d 447 [1965]), the petitioner alleged that he and decedent had entered into a common-law (non-ceremonial) marriage in Pennsylvania some years prior to her death. The parties had, however, subsequently exchanged mutual releases and each went on to marry another. The “strongly contested” (id. at 775) hearing concerned the validity of the common-law marriage, but the Surrogate found that question to be “academic” (id.), holding instead that “[w]ere the common-law marriage found to have existed, his subsequent abandonment would terminate any interests he might have in this estate for all purposes” (id. at 776). The finding of abandonment was premised on the petitioner’s remarriage, with the Surrogate quoting the language in the trial court opinion in Matter of Bingham, cited above.
The brief per curiam decision of three Justices of the Appellate Division affirmed, “upon the court’s opinion-decision, which denied the application [after a hearing] on the ground that the petitioner, despite his claim as the decedent’s surviving spouse, was not in any event a person interested in the estate,” concluding, “[d]ecree affirmed ... on the opinion of the Surrogate” (Matter of Oswald, 24 AD2d 465, 465 [1965]). Two Justices dissented, writing that the case should be remanded for findings as to whether or not there was a common-law marriage, and, if so, whether the parties’ releases caused the petitioner to lose his rights in decedent’s estate, and, finally, on “the issue as to whether, under all the circumstances, the petitioner had in fact abandoned the decedent” (id. [emphasis added]).[10]
Standing on its own, however, the Appellate Division majority per curiam decision in Oswald would appear to violate the continuing rule of Maiden.[11]
*438 The Court of Appeals affirmed without opinion (Matter of Oswald, 17 NY2d 447 [1965]). The “Summary” in the Official Reports[12] states,
“In the Court of Appeals appellant argued, in part, that, on the record, he had established his status as decedent’s common-law husband and that, in any event, the Surrogate’s finding of abandonment was contrary to law and to public policy. Respondent argued, in part, that the Surrogate’s findings as to abandonment and forfeiture were supported by the record, and that, in any event, appellant had failed to establish that his relationship with decedent was a common-law marriage under the law of Pennsylvania.” (Id. at 448.)
It is, thus, impossible to determine with certainty what the Court of Appeals intended by its affirmance. The Court might have agreed that there never was a marriage, or, consistent with the language in the Appellate Division per curiam, that appellant “was not in any event a person interested in the estate.” Or, it might have created, sub silentio, an exception to its longstanding Maiden decision that requires an express lack of consent by the party alleged to have been abandoned.
Distinguishing Oswald
The instant case can be factually distinguished from Oswald in at least two ways. There, the deceased wife could not even arguably have been seen to have consented to remain married to the man who ultimately claimed a spousal share of her estate; not only did they execute “mutual releases,” but she, herself, remarried another. Here, to the contrary, even as the March 2009 registration of Machida’s “marriage” in Japan was clearly void under New York law, decedent continued to rely on the continuation and legal validity of his marriage to her. As late as August 2009, decedent inquired about the effects of seeking a divorce from Machida on the capital gains tax he would owe on the sale of his second, Crosby Street, apartment. He was informed by his accountant that he “need[ed] to stay married” and he took no further action.
*439 In an uncontroverted affidavit produced by Machida, Bromberger, decedent’s accountant, writes:
“Based upon the email exchange between decedent . . . and myself referred to in the affidavit dated February 11, 2011 that I executed at the request of decedent’s parents’ counsel, I am convinced that in August, 2009 decedent. . . intended to remain married until after the sale of his Crosby Street loft.”
Decedent treated himself as married to Machida after her unquestionably void marriage to Klose, and was prepared to accept the benefits of that legal status in order to reduce or eliminate capital gains tax on the sale of his New York residence. This is the very opposite of what occurred in Oswald, where both parties treated the marriage as over, and abandoned, and where that decedent acted on the “end” of the marriage by herself remarrying. Given these uncontroverted facts, in the absence of the Court of Appeals’ ambiguous affirmance in Oswald, decedent’s parents would have failed to meet their burden.
There is another way to distinguish Oswald and the lower court decisions that appear to create an exception to Maiden. Whatever the import of Machida’s “marriage” in Japan, decedent was not simply passively acquiescent. Rather, by virtue of his participation as a witness to the registration, decedent was actively supportive of the very act claimed to be an unwanted abandonment.
Notwithstanding these distinctions and the uncertainty of meaning in the Court of Appeals’ perfunctory affirmance, to the extent the Court of Appeals affirmed the Appellate Division per curiam decision, which affirmed the Surrogate’s decision below, I believe that this court is constrained to hold in favor of decedent’s parents. Whether Oswald did or did not partially overrule, or create an exception to, Maiden is ultimately for the Court of Appeals to determine. Accordingly, decedent’s parents’ motion for summary judgment is granted and Machida’s cross motion for summary judgment dismissing the cross petition for letters of administration to Presseau is denied. Presseau is granted full letters of administration.
Policy Issues
In the absence of Oswald, the decision here would turn on specific facts relating to the decedent’s acquiescence in Machida’s “marriage” or “registration as married” to Klose and, thus, his lack of status as a “wronged” spouse who would be *440 entitled to a decree of separation or divorce based on abandonment under the Domestic Relations Law test for that fault-based ground. Those same facts suggest the need for a reappraisal of EPTL 5-1.2 (a) (5) and the purposes it was meant to serve. Such reappraisal is also appropriate under the changes in the Domestic Relations Law, itself, and the changing mores of today’s society.
The abandonment disqualification of EPTL 5-1.2 (a) (5) applies to several distinct issues relating to a decedent’s estate: the right to serve as administrator (SCPA 1001), the right to an intestate share (EPTL 4-1.1), and the right to elect against a will in which the surviving spouse is left less than one third of the decedent’s estate (EPTL 5-1.1-A). Like so much of the law, the purpose of the disqualification statute in each of these areas is based on assumptions which have, over time, evolved into policy. These assumptions (and the resulting policies) are, in turn, grounded in the conditions and mores of a particular society, at a particular time.
For example, when New York first enacted a divorce law, divorce was socially unacceptable and exceedingly rare. Marriage could be dissolved only when one spouse committed adultery, a grievous wrong against the other, and against the marriage.[13] The fault was understood as so great that the marriage was essentially destroyed, as were the rights and obligations (including the right to support) that arose from it. Accordingly, the wronged party could seek a judicial decree freeing herself or himself from the marriage, and from (in the case of men, since alimony was gender specific) any support obligation, and, of course, gain the right to marry another (cf. Domestic Relations Law § 6 [1]).
As time passed and parties seeking to end their marriages either found themselves locked in, or turning to increasingly fraudulent methods of “proving” adultery, the legislature expanded the grounds of divorce, including abandonment, but still required a showing of “fault” on the part of the defendant (see L 1966, ch 254; 1 Henry H. Foster Jr. et al., Law and the Family New York, Divorce, Separation and Annulment § 6:1 at 348-349 [2d ed 1987] [Foster, Freed & Brandes]). This insistence on fault was, in part, because divorce automatically *441 terminated the right to support, with potentially disastrous consequences for women who had left, or never entered, the work force (see Foster, Freed & Brandes § 6:1 at 351-352). Eventually the strict “fault = economic punishment” formula collapsed with enactment of the Equitable Distribution Law in 1980. Marriage was now understood as an “economic partnership” rather than a sacred contract for life; as such, the distribution of marital property was almost entirely disengaged from fault,[14] as was support, now denominated “maintenance.” Because of the Equitable Distribution Law, “[t]he automatic bar to alimony for a guilty wife had been eliminated” (Foster, Freed & Brandes at 353; see Domestic Relations Law, art 13, § 236 [A]).[15] Changing mores, the example of virtually every other state, and this decoupling of fault and loss of support have finally led New York to adopt true no-fault divorce (see n 1, supra). Under this new legal regime, property division and/or support may be judicially ordered not only where there was no fault, but even where there was no legal marriage.[16] Whether a spouse seeking a divorce was truly “wronged” by having been left against her or his wishes— with the accompanying burden of proof on lack of consent— thus becomes far less important, if not virtually irrelevant.[17] The reason for, or assumption about, the policy behind the strict definition of abandonment in the Domestic Relations Law— *442 which has been carried over into the EPTL — may thus no longer be valid or justified.
Thinking about the assumptions and policies behind spousal rights and spousal disqualification under the EPTL may cause a similar reappraisal. For example, a spouse has a presumptive right to administer the estate of a deceased spouse who dies intestate (SCPA 1001). Why? One reason, of course, is that she is entitled to receive the largest individual share of that estate (EPTL 4-1.1). Also, however, where marriages lasted and spouses resided together, the surviving spouse was likely to be more knowledgeable about the property in the estate and its management than any other who might be entitled to some portion of it.
And why should the surviving spouse be the sole distributee (see EPTL 4-1.1 [a] [2]), or, if decedent was survived by issue, a distributee entitled to $50,000 and one half of the residue (see EPTL 4-1.1 [a] [1])? The intestacy laws purport to reflect the “natural objects” of a decedent’s bounty, when she or he leaves no will. When marriages lasted until death, a spouse was clearly that “natural object.” But what of spouses who separate for years, if not decades, with no communication or affection between them? Are they still the “natural objects” of each other’s bounty? Almost certainly they are not. And what if, in the decades of their separation, each has entered into a new, fulfilling, committed relationship with another? Is not that second partner now ever so much more likely to be the natural, if not legal, object of her still legally married[18] partner’s bounty?
Current demographics and rapidly changing social beliefs (including, for example, about same-sex marriages) suggest that rethinking intestatacy succession in light of today’s world is long overdue.[19] The assumption that X, who has been separated from Y for 30 years and is living with Z in a happy, mutually *443 supportive relationship, would want Y, rather than Z, to inherit his entire estate (in the absence of children) is one that would be held by few, if any. Yet that is what the law, with its insistence on “wrongful abandonment,” requires. By the same token, why should Y have an absolute preference as administrator over A, X’s child who has lived with him and Z continuously, and who has worked with X in X’s business? (see Matter of Satterwhite, NYLJ, July 11, 2008 at 36, col 5 [Sur Ct, Kings County] [wife, separated from decedent for over 20 years, granted letters of administration over decedent’s adult daughter and son]). The use of “spouse” as a proxy for the person closest to (or most dependent on)[20] a decedent no longer reflects reality, at least for a large number of people, and the law might appropriately recognize this shift in social reality.
The current definition and/or standard for abandonment, imported from the now radically reoriented Domestic Relations Law, may no longer serve the purposes for which it was intended, or the premises on which it was based. Changing understandings of what constitutes family, demographic shifts, and alterations in economic dependence strongly suggest the need both to reappraise the spousal disqualification statute and the interests it serves: administration, intestacy and spousal election. One may hope that the bar and the legislature will hear and heed this call.
Presseau’s Motion to Consolidate the Administration Proceeding with the Action for a Declaratory Judgment
In 1990, before decedent met Machida, he entered into an annuity agreement with American Centurion Life Insurance Company. The agreement provides for the payment of a death *444 benefit, now valued at $350,000, to the person designated by the annuitant. In 2005, RiverSource, a stock life insurance company, succeeded to Centurion’s interest in the annuity agreement. RiverSource has no record of decedent’s having designated a beneficiary; none of the other parties has adduced evidence that decedent did designate a beneficiary.[21] The agreement prescribes the takers in default of a beneficiary designation, the first being the annuitant’s spouse (“If you do not name a beneficiary or if the beneficiary named by you is no longer living when the death benefit becomes payable, the beneficiary will be your spouse, if living”).
Machida, as decedent’s spouse, has applied to receive the death benefits under the agreement. Decedent’s parents seek a declaratory judgment that Machida is not entitled to the death benefits. Decedent’s parents suggest that, because Machida has forfeited her spousal rights in decedent’s intestate estate, she likewise has forfeited her entitlement under decedent’s annuity agreement.[22] They, however, cite no authority for that proposition.
The standard for determining a surviving spouse’s interest in a decedent’s intestate estate is different from the standard for determining a surviving spouse’s interest under an annuity agreement. The former is statutory: in the instant case, EPTL 4-1.1 (a) (2) and EPTL 5-1.2 (a) (5) are the relevant statutes. The latter is contractual: in the instant case, decedent’s agreement with RiverSource both creates the death benefit and provides for payment of such benefit in default of a beneficiary designation. Accordingly, Presseau’s motion to consolidate the administration proceeding and the action for declaratory judgment is denied.
*445 Matashichiro Hama and Sumiko Hama’s Declaratory Judgment Action against Machida and RiverSource
The annuity agreement, which provides for payment of a death benefit to decedent’s spouse, apparently does not define the word “spouse.” The Court of Appeals has ruled: “In the absence of any controlling statutory definition, we construe words of ordinary import with their usual and commonly understood meaning” (Rosner v Metropolitan Prop. & Liab. Ins. Co., 96 NY2d 475, 479-480 [2001]).
The parties do not dispute that the marriage between decedent and Machida: (a) was valid and (b) because there was no divorce or annulment, was not terminated before decedent’s death, at least as a matter of New York law, which governs here; hence, her status as decedent’s surviving spouse is undisputed. For the reasons discussed above, Machida, by purporting to marry a third person while still married to decedent, disqualified herself from the statutory benefits that otherwise accrue to a surviving spouse. Her entitlement under the contract, however, is not so conditioned. Machida was decedent’s spouse at the time of his death and, accordingly, is entitled to receive the death benefits under decedent’s annuity agreement (see Matter of Bortzfield, NYLJ, Jan. 5, 2006 at 20, col 1 [Sur Ct, Suffolk County, Czygier, S.]; cf. Matter of Crisman v Marsh & McLennan Cos., 6 AD3d 899, 900-901 [3d Dept 2004] and Matter of Caldwell v Alliance Consulting Group, 6 AD3d 761, 762-763 [3d Dept 2004], lv denied 3 NY3d 604 [2004]).[23]
Conclusion
The summary judgment motion filed by Presseau, the designee of decedent’s parents, is granted to the extent that: (1) *446 the administration petition of Machida and her designee, Kane, is dismissed for lack of standing, (2) temporary letters that issued to Kane are revoked, and (3) letters of administration are granted to Presseau. Thus, Machida and Kane’s cross motion for summary judgment is moot.
Presseau’s motion to consolidate the administration proceeding and the action, transferred from New York County Supreme Court, for declaratory judgment is denied.
The action commenced in New York County Supreme Court by decedent’s parents, Sumiko and Matashichiro Hama, against RiverSource Life Insurance Company of New York and Yuko Machida, for a declaratory judgment that Machida is not the default beneficiary of death benefits payable to decedent’s spouse, is denied.

. New York finally abandoned its fault-based system of divorce with enactment of a no-fault provision (Domestic Relations Law § 170 [7], as added by L 2010, ch 384, eff Oct. 12, 2010).

. The reason for the marriage, however, whether sham or otherwise, is not relevant to disqualification of a surviving spouse under EPTL 5-1.2 (a) (5) (see e.g. Estate of Dominguez, 2002 NY Slip Op 50481[U] [Sur Ct, Bronx County 2002]; cf. De George v American Airlines, Inc., 338 Fed Appx 15, 18 [2d Cir 2009], cert denied 558 US —, 130 S Ct 1068 [2010]) and Sho’s parents, the “next-in-line” distributees if Machida is disqualified, do not here seek to invalidate the marriage as a “sham.”

. Bromberger’s uncontroverted February 11, 2011 affidavit is submitted by decedent’s parents in support of their motion for summary judgment.

. In an affidavit Machida states that “Sho and I did not reside together in Japan,” but “our living apart was an arrangement agreed upon by mutual consent.”

. The parties have not provided enough information on Japanese law to determine precisely the effect of the March 2009 registration, but it is clear under New York law that, even if a purported marriage, it was void at the inception (“A marriage is absolutely void if contracted by a person whose husband or wife by a former marriage is living” [Domestic Relations Law § 6], unless the former marriage was legally dissolved [Domestic Relations Law § 6 (1), (3)] or annulled [Domestic Relations Law § 6 (1)]).

. Decedent’s parents designated Damianes Markou to receive letters of administration. On January 11, 2010, Markou petitioned for the issuance of letters of temporary administration to himself. On March 19, 2010, Kane cross-petitioned for the issuance of letters of temporary administration to himself. On May 19, 2010, the court ordered the issuance of temporary letters to Kane, who continues to act as fiduciary of decedent’s estate. On August 11, 2010, Matthew Presseau, a new designee of decedent’s parents, filed an amended petition seeking the issuance of letters of administration to himself, instead of to Markou.

. The legislative history for EPTL 5-1.2 provides: “Since the cases generally hold that the substantive law of abandonment . . . is no different under these statutes than in matrimonial actions no study of this substantive law is deemed necessary.” (4th Rep of Temp St Commn on Estates, 1965 NY Legis Doc No. 19, Report No. 1.14B at 275-276.)

. Interestingly, the Surrogate had previously defined abandonment as “desertion of a spouse with intent not to return, or with an intent that the marriage should no longer exist” (Bingham at 804 [citing a trial court decision]; Matter of Hess, 143 Misc 335, 336 [Sur Ct, Monroe County 1932]). Note that such focus is, contrary to other case law, entirely on the alleged abandoner’s intent, not the lack of consent of the party “abandoned.”

. The Second Department did not, however, affirm the Surrogate’s decision on this ground. In Bingham, the parties lived separately for 30 years after their marriage, and during that time the wife moved to Nevada where she obtained a divorce on the husband’s default. The husband, relying on the divorce, married another woman. At the wife’s death, the husband attempted to take an intestate share because her will made no provision for him. The Surrogate found that the wife had moved to Nevada “solely for the purpose of giving the court colorable jurisdiction of the divorce proceeding” (Matter of Bingham, 178 Misc at 803). Although the husband could have successfully challenged the divorce decree on jurisdictional grounds, he was estopped from doing so because “by remarrying, he accepted the benefits of that decree and recognized it as valid” (id. at 804). The Surrogate also held that the husband’s remarriage and subsequent cohabitation constituted abandonment, employing the language quoted above (id. at 806). On appeal, the Second Department affirmed on the first, jurisdictional ground only (“The appellant, by his remarriage, barred himself from questioning the validity of the decedent’s Nevada divorce. He was not entitled in this proceeding to claim to be the spouse of the decedent” [Matter of Bingham, 265 App Div 463, 467 (1943)]), and did not consider the proposition that remarriage constitutes abandonment.

. That is, the dissenters rejected the proposition that remarriage, by itself, constitutes abandonment.

. Significantly, in its reliance on the trial court opinion in Bingham, the *438 Surrogate in Oswald■ — and, presumably, three Justices of the Appellate Division — employed a definition of abandonment lacking the critical requirement of lack of consent (see n 8, supra and discussion of, e.g., Maiden, supra).

. According to the State Reporter, the summary of the case history that appears in the Official Reports is prepared by the Law Reporting Bureau, may be quoted with proper attribution, and is “official,” though it is not considered part of the Court’s opinion and is not legal authority.

. The statute, however, contained — and continues to contain — a moral anomaly: if both spouses were guilty of adultery, each had a defense to divorce, and so the doubly violated marriage continued in full force and effect (Domestic Relations Law § 171 [4]).

. Fault was neither included nor excluded from the original 10 factors a court was required to consider in dividing marital property, although some argued that the catchall tenth factor, “any other factor which the court shall expressly find to be just and proper,” encompassed fault (Domestic Relations Law § 236 [B] [5] [d] [former (10)]). The Court of Appeals ended this uncertainty with its decision in O’Brien v O’Brien (66 NY2d 576 [1985]), that fault could only be considered, and only as one of many factors, if it was egregious (id. at 589-590, citing Blickstein v Blickstein, 99 AD2d 287, 292 [2d Dept 1984], appeal dismissed 62 NY2d 802 [1984]).

. The original provision for maintenance in the 1980 Equitable Distribution Law was changed by amendment in 1986 (L 1986, ch 884, eff Aug. 2, 1986) to increase the number of factors considered from 10 to 13, and to replace the former standard of “reasonable needs” and “ability to pay” to “the standard of living of the parties established during the marriage” (Domestic Relations Law § 236 [B] [6]).

. This anomaly began with the Equitable Distribution Law, well before the adoption of true no-fault; in an action for a declaration of the nullity of a void marriage, the court may, at the same time it finds there never was a marriage, divide the parties’ [non] marital property (Domestic Relations Law § 236 [B] [2] [a]; see e.g. Lobotsky v Lobotsky, 122 AD2d 253 [2d Dept 1986]).

. Because the new no-fault provision requires six months of irretrievable breakdown (Domestic Relations Law § 170 [7]), a spouse or spouses seeking to terminate a marriage more quickly may still find the need to proceed on fault-based grounds.

. Of course people can avoid this problem by making a will (except for the problem of spousal election, discussed below) or by getting divorced. This, however, ignores both cultural norms and economic realities related to making wills, including lack of familiarity and/or comfort with lawyers, or the perception that one does not have an “estate” (where, for example, a person has little tangible property of value, but may have a pension with no beneficiary designation, or may die with a cause of action for negligence or pain and suffering). There are often similar economic and cultural reasons for not obtaining a legal divorce, as well as religious compunctions and, as here, potential tax consequences.

. Empirical research on how people would actually want their estates distributed, as opposed to how intestacy laws currently divide property, is only *443 recent and relatively limited (see generally Mary Louise Fellows et al., An Empirical Assessment of the Potential for Will Substitutes to Improve State Intestacy Statutes, 85 Ind LJ 409 [2010]; Alyssa A. DiRusso, Testacy and Intestacy: The Dynamics of Wills and Demographic Status, 23 Quinnipiac Prob LJ 36 [2009]).

. This touches on the third use of spousal disqualification, the elective share (EPTL 5-1.1-A). One of the reasons for the spousal share has always been to protect a surviving spouse who was dependent on her or his now deceased spouse. But why should that be the case for Y who, in our hypothetical, has neither depended on X, nor contributed anything to X’s support for three decades? Where does this leave Z, who may have provided domestic services to X which allowed him to prosper, who has been wholly dependent on X, and who is now unable or unlikely to find adequately paid employment in the workplace? And what, at least until New York’s adoption of same-sex marriage, if X and Z were never able to marry, even had X obtained a divorce, because they were same-sex partners?

. The affirmation in support of the order to show cause filed in Supreme Court reads: “The plaintiffs have reason to believe that the decedent named Sumiko Hama [decedent’s mother] beneficiary under the Agreement, but the record may have been lost when the Agreement was assigned by Centurion to Riversource.”

. Decedent’s parents argue, in their brief in support of consolidation and summary judgment:
“The Administration Proceeding and Action for Declaratory Judgment involve common questions of fact and overlapping questions of law. The central issues [sic] in both matters is whether Ms. Machida should be considered the surviving spouse of Mr. Hama and devolve upon the same facts. The questions of law raised by the motions for summary judgment in the two matters invoke the same laws except that the Administration Proceeding also concerns the application of EPTL § 5-1.2.”

. In Matter of Bortzfield, decedent was survived by his parents. Decedent had a life insurance policy, but had failed to designate a beneficiary. Under the terms of the policy, decedent’s parents were the default beneficiaries. Decedent’s mother argued that the father had abandoned decedent and therefore forfeited his right to one half of the life insurance proceeds, but the court granted summary judgment in favor of decedent’s father.
The court reasoned:
“A biological father who has abandoned his child is nevertheless a parent pursuant to the policy and the normal meaning of the word .... This would be so even if this court were to determine that Paul [decedent’s father] abandoned decedent, thereby disqualifying him from taking an intestate share (see Matter of Crisman v Marsh & McLennan Cos., 6 AD3d 899 [2004]). Nothing in the policy suggests otherwise, and respondent has provided no cases in support of its position.”